Slade R. Metcalf
Rachel F. Strom
Hogan Lovells US LLP
875 Third Avenue
New York, NY  10022
Telephone:   212/918-3000
Facsimile:   212/918-3100

Louis P. Petrich (*pro hac vice*)
Leopold, Petrich & Smith, P.C.
2049 Century Park East, Suite 3110
Los Angeles, California  90067
Telephone:   310/277-3333
Facsimile:   310/277-7444

Attorneys for Defendants
Twentieth Century Fox Film Corporation,
Paul W. S. Anderson and Davis Entertainment Company
(erroneously sued herein as Davis Entertainment, Inc.)


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x       08 CIV. 02550 (DC)
JAMES MULLER,                                          :

                         Plaintiff,                   :

      -against-                                       :

TWENTIETH CENTURY FOX FILM               :
CORPORATION, PAUL W.S. ANDERSON
and DAVIS ENTERTAINMENT, INC.,           :

                         Defendants.      x
------------------------------------------------------


**MEMORANDUM OF LAW OF DEFENDANTS TWENTIETH CENTURY FOX FILM
CORPORATION, PAUL W. S. ANDERSON AND DAVIS ENTERTAINMENT
COMPANY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND,
IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION**

# TABLE OF CONTENTS

Page(s)

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................................1

I.  INTRODUCTION ...........................................................................................................1

II.  STATEMENT OF FACTS ...........................................................................................3

    **A.**  Creation and Dissemination of the Defendants' *AVP* Movie ...............................3

        **1.**  The Principal Prior Works ........................................................................4

        **2.**  Development and release of the *AVP* Movie ........................................10

    **B.**  Summary of the Subject Movie *Aliens v. Predator* .......................................11

    **C.**  Development of Plaintiff's *TLC* Screenplay .....................................................12

    **D.**  Summary of Plaintiff's Screenplay, *TLC* ..........................................................12

    **E.**  Dissemination of *TLC* ........................................................................................14

    **F.**  Lack of Access to *TLC* by the Creators of *AVP* ...............................................15

        **1.**  No Access by the *AVP* Creator Paul Anderson......................................15

        **2.**  No Access by Defendant Davis Entertainment Company .......................15

        **3.**  Access by Fox 2000 ................................................................................15

III.  SUMMARY JUDGMENT STANDARDS ....................................................................15

IV.  THE COPYRIGHT CLAIM .......................................................................................16

    **A.**  *AVP* Does Not Appropriate Protectible Elements of the Plaintiff's *TLC* Script ....................................................................................................................17

        **1.**  No Substantial Similarity As To Themes ...............................................20

        **2.**  No Substantial Similarity As To Characters...........................................21

        **3.**  No Substantial Similarity As To Settings ...............................................23

        **4.**  No Substantial Similarity As To Plot and Sequences of Events ..............23

        **5.**  No Substantial Similarity As To Dialogue ..............................................23

        **6.**  No Substantial Similarity As To Pace Or Mood......................................24

        **7.**  No Substantial Similarity As To Overall Concept And Feel....................24

        **8.**  Lists Of Purported "Similarities" Such as Plaintiff's Cannot Raise A Triable Issue ........................................................................................24

        **9.**  Application of the Test for Fragmented Literal Similarity ......................25

    **B.**  Because Plaintiff Cannot Raise a Genuine Issue As To The Element Of Actual Copying, Summary Judgment Should Be Entered For Defendants .........25

        **1.**  Plaintiff's Supposed Evidence of "Access" and "Probative Similarity" Is Too Speculative And Conjectural to Raise An Inference Of Actual Copying ....................................................................26

        **2.**  The Evidence Of Independent Creation Of the New Matter In The Movie Overcomes Any Alleged Inference of Actual Copying.................28

V.  THE BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED .........................29

    **A.**  The Allegations..................................................................................................30

    **B.**  Plaintiff Has No Evidence To Support The Contract Claim ...............................30

## TABLE OF CONTENTS

Page(s)

    **1.**    No Privity Between Plaintiff and Anderson and DEC ............................30

    **2.**    No Mutual Assent.................................................................................30

    **3.**    No Certainty As To Material Terms.......................................................30

**C.**    No Use/Independent Creation ........................................................................31

**D.**    Plaintiff's Contract Claim Is Substantially Equivalent To Copyright Claims And Preempted By The U.S. Copyright Law ...........................................32

**VI.**    CONCLUSION ...........................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A Slice of Pie Prods., LLC v. Wayans Bros. Entert.*,
    487 F.Supp.2d 41 (D. Conn. 2007) ................................................................35

*ARC Music Corp. v. Lee*,
    296 F.2d 186 (2d Cir. 1961) .........................................................................17

*Arpaia v. Anheuser-Busch Companies, Inc.*,
    55 F. Supp. 2d 151 (W.D.N.Y. 1999) ...........................................................34

*Baer v. Chase*,
    392 F.3d 609 (3d Cir. 2004) .........................................................................31

*Berkic v. Crichton*,
    761 F.2d 1289 (9th Cir. 1985) ......................................................................17

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004) .............................................................33, 34, 35

*Calhoun v. Lillenas Publ'g*,
    298 F.3d 1228 (11th Cir. 2002)......................................................................29

*CCC Information Serv., Inc. v. McLean Hunter Market Reports, Inc.*,
    44 F.3d 61 (2d Cir, 1984) .............................................................................20

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) .....................................16

*Chase-Riboud v. DreamWorks, Inc.*,
    987 F. Supp. 1222 (C.D. Cal 1997) (Collins, J.)...............................................21

*Daubert v. Merrell Dow Pharmaceuticals*,
    509 U.S. 579, 113 S.Ct.2786, 125 L.Ed. 2d 469 (1993) ...................................28

*Denker v. Uhry*,
    820 F.Supp. 722 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 301 (2d Cir. 1993) ...............21

*Downey v. General Foods Corp.*, 37 App.Div.2d 250, 254, 323 N.Y.S.2d 578 (1971),
    *rev'd on other grounds*, 31 N.Y.2d 56, 286 N.E.2d 257 (1972)...........................31

*Feist Publications, Inc. v. Rural Tele. Serv. Co.*,
    499 U.S. 340, 1115 S.Ct. 1282, 113 L.Ed.2d 358 (1991) .......................16, 17, 25

*Folio Impressions, Inc. v. Byer California*,
    937 F.2d 759 (2d Cir. 1991) .........................................................................19

## TABLE OF AUTHORITIES

*Green v. Lindsey,*
 885 F.Supp. 469 (S.D.N.Y. 1992) *aff'd*, 9 F.3d 1537 (2d Cir. 1993) ...................................24

*Grombach Productions, Inc. v. Waring,*
 293 N.Y. 609, 59 N.E.2d 425 (1944) ...................................................................................31

*Hamil Am., Inc. v. GFI,*
 193 F.3d 92 (2d Cir. 1999) ...................................................................................................19

*Harper & Row, Publishers, Inc. v. Nation Enters.,*
 723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985).........................33

*Harper & Row, Publishers v. Nation Enterprises,*
 471 U.S. 539, 85 L.Ed.2d 588, 105 S.Ct. 2218 (1985) .......................................................17

*Herzog v. Castle Rock Entertainment,*
 193 F.3d 1241 (11th Cir. 1999)...........................................................................................28

*Hollywood Screentest of America, Inc. v. NBC Universal, Inc.,*
 51 Cal.App.4th 631, 60 Cal.Rptr. 279 (2007)......................................................................32

*Jones v. Blige,*
 558 F.3d 485 (6th Cir. 2009) ................................................................................................27

*Jones v. CBS, Inc.,*
 733 F.Supp. 748 (S.D.N.Y. 1990) ........................................................................................21

*Jorgensen v. Epic/Sony Records,*
 351 F.3d 46 (2d Cir. 2003) .............................................................................. 15, 26, 27

*Knitwaves, Inc. v. Lollytogs Ltd.,*
 71 F.3d 996 (2d Cir. 1995) ...................................................................................................19

*Lewinson v. Henry Holt & Co.,*
 659 F.Supp.2d 547 (S.D.N.Y. 2009) ....................................................................................20

*Littel v. Twentieth Century Fox Film Corp.,*
 1995 WL 404939 (S.D.N.Y. 1995) (Cote, J.) *aff'd* 100 F.3d 943, 1996 WL 47971 (2d
 Cir. 1996) ...............................................................................................................................7

*Maas v. Cornell Univ.,*
 94 N.Y.2d 87, 699 N.Y.S.2d 716 (1999)..............................................................................30

*Maharam v. Patterson,*
 No. 07-4715-cv 2010 WL 827088  (2d Cir. 2010)  (explaining *Repp v. Webber*) ...........26, 29

*Markogianis v. Burger King Corp.,*
 1997 WL 167113 (S.D.N.Y. 1997) .................................................................................31, 34

# TABLE OF AUTHORITIES

*Mazer v. Stein,*
    347 U.S. 201, 98 L.Ed. 630, 74 S.Ct. 460 (1954) ............................................................. 25

*McGhan v. Ebersol,*
    608 F.Supp. 277 (S.D.N.Y. 1985) ................................................................................... 31

*Meta-Film Assocs., Inc. v. MCA, Inc,*
    586 F.Supp. 1346 (C.D. Cal. 1984) ................................................................................ 27

*Mowry v. Viacom Intl., Inc.,*
    2005 WL 1793773 (S.D.N.Y. 2005) .............................................................................. 26

*Murray Hill Pubs., Inc. v. Twentieth Century Fox Film Corp.,*
    361 F.3d 312 (6th Cir. 2004) ................................................................................... 20, 29

*MyWebGrocer, LLC v. Hometown Info, Inc.,*
    375 F.3d 190 (2d Cir. 2004) ........................................................................................... 18

*Nadel v. Play-by-Play Toys & Novelties, Inc.,*
    208 F.3d 368 (2d Cir. 2000) ..................................................................................... 30, 32

*Narell v. Freeman,*
    872 F.2d 907 (9th Cir. 1989) ......................................................................................... 24

*National Basketball Assn v. Motorola, Inc.,*
    105 F.3d 841 (2d Cir. 1997) ........................................................................................... 34

*Nichols v. Universal Pictures Corp.,*
    45 F.2d 119 (2d Cir. 1930), *cert. denied,* 282 U.S. 902 (1931) .................................... 19

*Nunley v. City of Los Angeles,*
    52 F.3d 792 (9th Cir. 1995) ........................................................................................... 29

*Oasis Music, Inc. v. 900 USA, Inc.,*
    161 Misc.2d 627, 614 N.Y.S. 878 (1994) ...................................................................... 32

*Paramount Pictures Corp. v. Carol Publishing Group,*
    11 F.Supp.2d 329 (S.D.N.Y. 1998), *aff'd,* 181 F.3d 83 (2d Cir. 1999) ........................ 25

*Paul v. Haley,*
    183 A.D.2d 44, 588 N.Y.S.2d 897 (N.Y. App. Div. 1992) ............................................ 32

*Porto v. Guiris,*
    659 F.Supp.2d 597 (S.D.N.Y. 2009) ................................................... 19, 25, 26, 28

*Repp v. Webber,*
    132 F.3d 882 (2d Cir. 1997) ........................................................................................... 26

# TABLE OF AUTHORITIES

*Saunder v. Baryshnikov*,
  110 A.D. 2d 511, 487 N.Y.S. 2d 51 (1985) ........................................................................31

*Selby v. New Line Cinema Corp.*,
  96 F.Supp.2d 1053 (C.D. Cal. 2000) ................................................................................35

*Smith v. New Line Cinema*,
  No. 03 Civ. 5274 (DC), 2004 WL 2049232 (S.D.N.Y. Sept. 13, 2004) (Chin, J.) ...........34, 35

*Smith v. Weinstein*,
  578 F.Supp. 1297, 1303 (S.D.N.Y. 1984) .........................................................................18

*Southco, Inc. v. Kanebridge Corp.*,
  390 F. 3d 276 (3rd Cir. 2004) ...........................................................................................24

*Sparaco v. Lawler, Matusky Shelly Eng'rs LLP*,
  303 F.3d 460 (2d Cir. 2002) ..............................................................................................18

*Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996) ..............................................................27

*Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*,
  996 F.2d 1366 (2d Cir. 1993) ............................................................................................18

*Walker v. Time-Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1986) ................................................................................18, 20, 23

*Warner Bros., Inc. v. American Broadcasting Cos., Inc.*,
  720 F.2d 231 (2d Cir. 1983) ............................................................................17, 21, 25

*Warner Bros. Ent. v. RDR Books*,
  575 F.Supp.2d 513 (S.D.N.Y. 2008) .................................................................................18

*Warner Bros. Inc. v. American Broadcasting Co.*,
  654 F.2d 204 (2d Cir. 1981) ("*Warner Bros. I*") ..............................................................18

*Williams v. Crichton*,
  84 F.3d 581 (2d Cir. 1996) .......................................................... 16, 17, 18, 19, 20, 23, 24, 25

*Wolff v. Inst. of Elecs. & Elec. Eng'rs, Inc.*,
  768 F. Supp. 66 (S.D.N.Y. 1991) ......................................................................................34

*Zambito v. Paramount Pictures Corp.*,
  613 F.Supp. 1107 (E.D.N.Y. 1985) .............................................................................18, 24

## STATUTES

17 U.S.C. § 102 ........................................................................................................17, 33

17 U.S.C. § 106 ..................................................................................................................33

## TABLE OF AUTHORITIES

17 U.S.C. § 301.................................................................................................................33

**FEDERAL RULES**

Federal Rules of Civil Procedure 56(c)..................................................................................16

Federal Rules of Evidence 702 and 403................................................................................28

**TREATISES**

*4 M. & D. Nimmer, Nimmer On Copyright* ("*Nimmer*")..........................16, 17, 18, 19, 25, 26, 32

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Twentieth Century Fox Film Corporation ("Fox"), Paul W.S. Anderson ("Anderson") and Davis Entertainment Company ("DEC") (collectively "Defendants") move for summary judgment on the two claims alleged in Plaintiff's First Amended Complaint ("FAC"), for copyright infringement and for breach of an implied contract.

## I.   INTRODUCTION

For the last thirty years, Fox has produced a series of films, comic books, and video games from its two huge science fiction franchises, *Alien* and *Predator*. A 1990 comic book series, *Aliens vs. Predator*, licensed by Fox, joined the two alien creatures for an epic battle. In 2002, screenwriter/director Anderson pitched a story to Fox for a feature length film that also would combine the two franchises, resulting in the subject 2004 film, *Alien vs. Predator* ("*AVP*" or "the Movie"). The title is the plot: Predators come to Earth to battle Aliens. Plaintiff, meanwhile, wrote an unpublished movie screenplay, *The Lost Continent ("TLC")*, in 1996 with an entirely different theme, characters (no Aliens, no Predator) and plot: a cult of Freemasons known as the Illuminati who plot to recover a powerful crystal from Atlantis and its devil worshiping king, with the help of the U.S. President, Navy SEALs, the NSA and a Princeton archeologist. After sending copies of his screenplay to various film and television producers in the 1990s, Plaintiff now alleges that Fox's *AVP* must have been copied from *his TLC*.[1]

Plaintiff's copyright infringement claim is without merit for several reasons: First, Plaintiff cannot show an issue of fact as to the required element of "actual copying" (*i.e.*, that *AVP* took material from *TLC* even to a minor extent) because Plaintiff can show neither access to the creators of *AVP* nor probative similarity between the two works to create an inference that *AVP* copied *TLC*. Defendant Anderson's *AVP* draft script that he delivered to Fox and DEC

---

[1] Plaintiff registered *TLC* with the Copyright Office in 2007, three years after the release of *AVP*, and filed this action on January 5, 2009. Defendants' Statement of Material Facts That Are Undisputed ["SOF"] ¶ 23.

producers in November, 2002, was written solely by Anderson. The draft contains virtually all of the elements Plaintiff contends are infringing.  Anderson is thus effectively the sole creator of *AVP* for purposes of the lawsuit.  Anderson has testified that he never saw *TLC*, and Plaintiff has no evidence that Anderson received *TLC* prior to writing his first draft of *AVP* (or at all).  Moreover, even if access to Fox or DEC were relevant, Plaintiff cannot show that DEC or the division of Fox responsible for *AVP* received *TLC*.[2]  Further, almost every allegedly similar element in *AVP* is traceable to the works on which *AVP* is openly and deliberately based; *i.e.*, the earlier works which are the genetic material – the very DNA – of the Movie.  Therefore, there is no issue as to "probative similarity" between the works, and Plaintiff cannot satisfy the second prong required to create an inference of actual copying.

Even if Plaintiff's evidence were sufficient to create a triable issue as to "actual copying," however, summary judgment is still required because Plaintiff cannot prove the other critical element of Plaintiff's infringement claim:  that the Movie is substantially similar to <u>legally protectible</u> elements in *TLC*, as opposed to mere ideas and *scénes-á-faire*, and material from Fox-owned works which were included in the *AVP* prequel/sequel.

While both works contain the unprotectible idea of setting action in a pyramid in or near one of the remotest locations on Earth, Antarctica, the works are substantially different in their protectable expressions.  They have entirely different stories, with different characters.  Dismissal is appropriate even under the lowest threshold average lay observer test.  *AVP* is a continuation of stories about Predators who test their hunting prowess, in this case by combating Aliens incubated in human hosts, who were lured to a remote spot near Antarctica.  *TLC* is a story about the diabolical plot of Illuminati Freemasons who recruit an unwitting team to travel to Antarctica to secure a crystal – "the Eye of Lucifer" with powers to control the world.

Further, because of *AVP's* pedigree as a sequel and prequel of works existing before *TLC*,

---

[2] An agent submitted a copy of *TLC* to Fox 2000, a division of Defendant Fox in 1998, and Plaintiff claims to have submitted a copy to two independent producers whose offices were at DEC.  Because neither Fox 2000 nor the two production companies had any involvement in *AVP*, there is no triable issue regarding "access" of *TLC* by the creators of *AVP*.

the claim borders on the frivolous under the "more discerning lay observer test" applicable here which requires a filtering out of *AVP* all the material anticipated by Fox's prior works from its *Alien* and *Predator* franchise – all published from 1976-1992. (*AVP* is lodged as Kennedy Dec., Exs. 7, 8; *TLC* is Ex. 23;  a montage of relevant clips from the prior Fox *Alien* and *Predator* franchises is attached to Gillham Dec., Ex. 24 ).

Lastly, even if Plaintiff could raise an inference of actual copying, which he cannot, the uncontroverted evidence of independent creation in this case overcomes any supposed inference of copying and defeats any *prima facie* case of infringement.  From 1976-1992, well before Plaintiff wrote his TLC screenplay in 1995 and circulated it in the late 1990s – the existence of Fox's own *Alien* and *Predator* works establish that AVP, an obvious prequel and sequel, was created independently from and not based on Plaintiff's unpublished screenplay.

Finally, Plaintiff's second  claim, for breach of implied in fact contract, must be dismissed because there is no agreement with Defendants Anderson and DEC, no enforceable agreement by any defendant to pay plaintiff for ideas, no evidence that any "novel" ideas were used, and the claim is  preempted by the federal copyright laws.

## II.   STATEMENT OF FACTS

### A.   Creation and Dissemination of the Defendants' *AVP* Movie

*AVP* is a sequel and prequel of several films, the copyrights of which are owned by Defendant Fox – the movies, *Alien* (1979); *Aliens* (1986); *Alien 3* (1992), *Alien Resurrection* (1997), *Predator* (1987) and *Predator 2* (1990), as well as a 1999 video game called *Alien vs. Predator* and comic books published in 1990 and 1991 entitled *Aliens vs. Predator* and *Predator: Cold War*.  SOF ¶ 14.  In addition, as set forth below, the 1976 Alien screenplay contained elements that did not make it into the 1979*Alien* as filmed, but which were incorporated into *AVP*.[3]  The four *Alien* films are set in a distant future in which a villainous

---

[3] The drawings of pyramids in the 1976 *Alien* screenplay which were not used in the 1979 Alien movie were published in the *Book of Alien*, written by H.R. Giger, the major art designer of the *Alien* movie, and relied upon for inspiration by defendant Anderson when he wrote AVP. Anderson Declaration ("Dec.") ¶ 22 & Exs. 9, 10.

mega-corporation, Weyland-Yutani Corporation, unscrupulously attempts to acquire specimens of a parasitic Alien species to use as a biological weapon, even though its efforts cause the death of many of its employees and others.  By contrast, the *Predator* series consisted of two films, *Predator* and *Predator 2*, set in the near present day.  These films feature  an extra-terrestrial warrior species "Predator" that sends its young to Earth for an initiation rite that involves the killing of other species' warriors (the 1990 film *Predator 2* also contains a reference to killing an Alien).  *AVP* creates a hybrid of the *Alien* and *Predator* stories by setting the action on the Earth in the near future, where the predecessor of the Weyland-Yutani Corporation, Weyland Industries, led by the same individual who forms the prototype for the android in *Aliens* and *Alien 3*, Charles Bishop Weyland, is lured to an ancient pyramid under the Antarctic ice cap where Predators have placed Aliens, in order to conduct their ritual hunts.  As in almost every *Alien* and *Predator* film, the conclusion is a climactic explosion from which only a tiny number of the characters escape a violent death.

1.        **The Principal Prior Works**

(a)      <u>Screenplay *Alien* (Fox 1976)</u>.  Written by Dan O'Bannon and Ronald Shusett, this screenplay introduced material that did not appear in the 1979 filmincluding the crew's exploration of a mysterious stone pyramid with a hole in the top that was noticeably warmer inside.  The pyramid, when it is explored, contains strange hieroglyphics which the crew eventually deciphers as depictions of the life cycle of the Alien.  Inside the pyramid, stylized stone statutes depict grotesque monsters.  It is discovered that the pyramid is a brood chamber for Alien eggs.  Several of these elements were later incorporated into *AVP*.  O'Bannon and Shusett received a story credit on *AVP* based on their earlier works' contributions to *AVP* as did the writers of *Predator*.[4]  SOF ¶¶ 5, 15.

---

[4] The writing credits for *AVP* were as follows:  "Screenplay by Paul W.S. Anderson, Screen Story by Paul W.S. Anderson and Dan O'Bannon and Ronald Shusett, based on the '*Alien*' Characters created by Dan O'Bannon and Ronald Shusett, and the '*Predator*' Characters Created by Jim Thomas and John Thomas."  SOF ¶ 15.

(b)   <u>Motion Picture *Alien* (Fox 1979)</u>[5].  Set in the distant future, a commercial cargo spaceship is returning to earth with its seven-member crew in a state of hypersleep.  The ship receives a mysterious transmission from a nearby small planet which awakens the crew.  The crew is ordered by the ship's corporate owner to land on the asteroid and investigate the origin of the signal. The signal has come from a derelict alien spacecraft.  They discover strange organic forms including numerous eggs, one of which releases a creature that attacks a crewmember's face.  Unable to detach the creature from his face, they return the crewmember to the ship.  The creature turns out to be a parasitic Alien that bursts from the crewmember's chest, killing him.  The crew then attempts to locate and capture the creature, led by Warrant Officer Ellen Ripley, played by Sigourney Weaver.  Ripley discovers that the ship's owner, the Weylan-Yutani Corporation, employing an android, have secretly been attempting to return the Alien to Earth, even if it risks the death of the crew.  The remaining crewmembers arm the ship's self-destruct mechanism and attempt to escape in its shuttle, but the Alien kills them before they can escape.  The ship explodes in a massive blast; but Ripley manages to escape the explosion in the shuttle.  As Ripley prepares to hypersleep, she discovers that the Alien is aboard the shuttle.  Ripley manages to force the Alien out of the ship and blasts it into space.  The film ends with Ripley, the sole human survivor, re-entering hypersleep for the return trip.  SOF ¶ 6.

(c)   <u>Motion Picture *Aliens* (Fox 1986)</u>.  Set 57 years after the story in *Alien*, Ripley (played again by Sigourney Weaver) must provide testimony before executives from her employer, the owner of the cargo ship.  Her testimony regarding the Alien is disbelieved, and she loses her space flight license.  She learns that the asteroid where she

---

[5]  In 2002, the Librarian of Congress selected *Alien* as one of 25 "culturally, historically, or aesthetically" significant films added to the National Film Registry under the terms of the National Film Preservation Act of 1988 (Public Law 100-446, and successor statutes). www.loc.gov/today/pr/2002/02-176.html

encountered the Alien eggs is now home to a colony of settlers.  She is informed by her employer, now named Weyland-Yutani Corporation, and a Colonial Marine that the colony has lost contact with Earth, and that her employer is sending its executive along with an android, Bishop (played by Lance Henriksen), and a unit of marines.  Ripley initially refuses to join the expedition, even when promised a chance to regain her flight status, but reluctantly accepts when the company's representative assures her that the objective will be the destruction of the Alien, not its preservation.  The heavily armed expedition returns to the planet, where two living Alien specimens are found in the colony's medical lab, and the only surviving colonist is a young girl, Newt.  The marines are attacked by the Aliens and most are killed.  The survivors, with Ripley, attempt to return to the mother ship to destroy the colony from orbit.  A stowaway Alien kills the pilots, forcing the survivors to barricade themselves inside the colony.  Ripley discovers that Weyland-Yutani Corporation has sent its representative with the secret agenda to return Alien specimens to Earth so he can then use them as biological weapons.  The survivors attempt to reach the mother ship in a shuttle and are attacked by Aliens, who kill all of the occupants of the shuttle other than Ripley, Newt, Corporal Hicks, and the badly damaged android, Bishop.  Pursued by the Alien queen, Ripley and the others manage to rendezvous with a shuttle and escape from the asteroid moments before the colony is destroyed by a nuclear explosion.  Back on the mother ship, Ripley finds that the Alien queen has managed to get onto the mothership .  Ripley battles the Alien queen using an exoskeleton cargo-loading device, and the two of them tumble into a large air lock, which Ripley opens, expelling the Alien queen into space.  Ripley survives, along with Newt, Hicks, and an android, entering hypersleep for the return to Earth.  SOF ¶ 7.

               (d)       Motion Picture *Alien 3* (Fox 1992).  Immediately following the events in *Aliens*, the mother ship experiences an on-board fire.  An escape pod is automatically activated, which releases Ripley and the other survivors from the ship.  Apparently, an Alien specimen has managed to attach itself to one of the crewmembers.  The pod then crashes on a penal colony planet.  Ripley is awakened, and is informed that she is the only survivor of the

crash.  A prison dog goes into convulsions and an Alien bursts from its body.  The Alien attacks

members of the prison colony.  Ripley reactivates the damaged android, Bishop (played by

Lance Henriksen), that had escaped with her at the end of *Aliens*, and it tells her that there had

been an Alien on the mother ship that had come with them in the escape pod.  The Alien

proceeds to kill the prison's doctor and warden, but apparently chooses not to kill Ripley.  Ripley

discovers that there is the embryo of an Alien queen growing inside her.  She finds out that

Weyland-Yutani Corporation once again plans to obtain this embryo, and an adult Alien, hoping

to turn them into biological weapons.  Ripley begs Dillon, the leader of the prison inmates, to kill

her, and he agrees to do so only if she helps the inmates kill the adult Alien first.  They succeed

in killing the Alien.  The rescue ship sent by Ripley's employer arrives, including a human

named Bishop who looks identical to the android, and who claims to be its creator.  Ripley

refuses rescue, and a fight begins between the company men who beg Ripley to let them have the

embryo, and the prisoners.  Ripley refuses to allow the company to have the embryo, and throws

herself into the gigantic furnace of the foundry, just as the Alien queen has begun to erupt from

her chest.  She and the Alien queen die in the fire. SOF ¶ 8.

(e)     Motion Picture *Predator (*Fox 1987*)*.[6]  Set in the present day, the

film opens with a large spaceship releasing a mysterious space vehicle headed toward Earth.

There, a commando force, led by Major Alan "Dutch" Schaeffer (Arnold Schwarzenegger) is in

Central America, where they have been recruited by CIA officer George Dillon (Carl Weathers)

to attempt to rescue a cabinet minister kidnapped by guerilla forces.  The team of mercenaries

travel by helicopter to its destination within the jungle.  They find the remains of a downed

helicopter, and later the bodies of several men who have been skinned, who are identified as U.S.

Army Special Forces soldiers.  They proceed to a rebel encampment, kill the rebels, except for a

girl, Anna, whom they take prisoner.  Schaeffer is enraged to discover that the rescue mission

has been a pretext to get his group to destroy the camp, after Dillon confesses that the men they

---

[6]     *Predator* and *Predator 2* were summarized by this Court and found not to infringe in
*Littel v. Twentieth Century Fox Film Corp.*, 1995 WL 404939 (S.D.N.Y. 1995) (Cote, J.) *aff'd*
100 F.3d 943, 1996 WL 47971 (2d Cir. 1996).

found earlier disappeared in a failed rescue mission of two CIA agents.  As Dillon and Schaeffer prepare to leave, they are observed by an unknown creature via thermal imaging.  After members of the team are mysteriously killed, it becomes evident that something in the jungle is now stalking them.  Anna explains that a creature is well known to the local villagers for hunting humans as trophies.  The mercenary team members are killed off one-by-one by the Predator, until the only survivors are Dutch and Anna.  Inferring that the creature only kills those who possess weapons, Dutch saves Anna by sending her away unarmed.  Wounded, Schaeffer narrowly escapes the creature when he accidentally covers himself in mud, which hides his body's thermal signature.  Schaeffer confronts the creature, using the mud as camouflage.  It manages to corner Schaeffer.  Instead of killing him, it challenges Schaeffer to a one-to-one duel.  Schaeffer manages to outwit the creature by dropping a huge weight from a trap, which crushes the creature.  The mortally wounded Predator activates a powerful time bomb that incinerates a huge area.  Anna and Schaeffer escape in a helicopter.  SOF ¶ 9.

      (f)    Motion Picture *Predator 2* (Fox 1990).  Set in Los Angeles in 1997, Los Angeles police detectives and their boss, Lieutenant Harrigan (Danny Glover), are baffled by a series of incidents in which ultra-violent local criminals have been mysteriously slaughtered.  Unknown to them, a Predator has been responsible for the murders.  Federal special agent Peter Keyes is leading a task force purportedly investigating the Colombian and Jamaican drug cartels.  The Predator is taking advantage of the conflict between the armed criminals by killing them.  Later, the Predator begins killing the police.  The police discover that the weapon left at one of the scenes does not have a terrestrial origin, and conclude that whatever is causing the killings is not from this world.  Special agent Keyes finally reveals to Harrigan that the federal task force has been following encounter sites with the otherworld life form ever since Major Alan Schaeffer (protagonist of the first film) and his team were attacked in the jungle ten years ago.  Keyes hopes to capture the creature for study, and has set up a trap in a vacant slaughterhouse.  The Predator foils the plot, attacking the government team, killing everyone except Keyes.  In the ensuing battle, Keyes fights the Predator with a specialized liquid nitrogen

cannon, but the Predator slices Keyes in half with a smart-disc weapon.  Harrigan steals the

Predator's weapon and uses it to cut the Predator's forearm off, destroying the self-destruct time

bomb.  Harrigan follows the Predator to its cavernous underground spaceship, with a trophy

room containing skulls of its prey (including an Alien), where Harrigan fights and kills the

Predator.  Several more Predators suddenly appear, carrying away the dead Predator, while an

older Predator gives Harrigan an 18th century antique pistol as a sign of respect.  The ship blasts

off into space as the remainder of Keyes' team arrives, furious that they were unable to capture

the Predator.  SOF ¶ 10.

          (g)     Comic Book, *Aliens vs. Predator* (Dark Horse Comics/Fox 1990).

The *Aliens vs. Predator* series of comic books is set on a recently colonized planet called Ryushi

which, unknown to the colonists, is a traditional hunting ground of the Predators who are

returning for their initiation rites.  The Predators seed the planet with Aliens, which hatch and

infect the colonists' livestock on that planet.  When the Predators arrive for their hunt, they

encounter the settlers, and decide to hunt them.  The settlers find themselves stuck in a battle

between the Alien-infected livestock and the Aliens, on the one hand, and the Predators, on the

other.  The female protagonist Machiko, one of the settlers, decides out of desperation to ally

herself with a Predator by the name of Broken Tusk.  They arrange to have an orbiter from a

space vehicle crash into the planet, which destroys most of the colony and the Aliens.  The

Predator Broken Tusk is mortally wounded by the Aliens but, before he dies, places the mark of

his Predator clan on Machiko's forehead.  The only survivor on the planet is Machiko, and the

Predators return and permit Machiko to accompany them on another hunt for the Aliens.  SOF ¶

11.

          (h)     Comic Book, *Predator: Cold War* (Dark Horse Comics/Fox 1991).

Written by Mark Verheiden and published in 1991, this comic book tells the story of a Predator

spacecraft which crash-lands in an isolated northern tundra of Siberia.  When a U.S. government

satellite station reads the thermal signature of the crash, the U.S. government abducts Dutch

Schaeffer's brother, a New York City detective, and coerces him to assist them in capturing the

technology.  The Schaeffer team and the female led Russian team try to find ways to prevent the U.S. and Russia from launching all-out war on each other, while at the same time trying to get custody of the Predator ship, and fighting for their lives.  SOF ¶ 12.

        (i)    *Alien vs. Predator* (Videogame/Fox (1999).  This videogame gives the player a chance to pit humans against Aliens and Predators in the dark corridors of an ancient temple resembling those in *AVP*.  SOF ¶ 13.

### 2.    Development and release of the *AVP* Movie

John Davis, the President of defendant DEC  was a producer on the films *Predator* (1987) and *Predator 2* (1990).  After the release of *Predator 2*, Mr. Davis became aware of the series of *Alien vs. Predator* comic books first published in 1990 by Dark Horse Comics based on licenses from Fox.  He thought that the comic book pairing of *Alien* and *Predator* might be quite successful in a movie and let it be known that he would like to produce a movie that developed that idea.   SOF ¶¶ 4, 16.

In April 2002, Davis met with defendant Paul Anderson to consider Anderson as a possible director for a movie called *Paycheck*.  Anderson knew (from his agent) of Davis' interest in making an *AVP* movie and told Davis that he had a story for such a movie.  They met and Anderson recounted in great detail his story for what became the *AVP* movie.  Davis arranged for Anderson and Davis to meet with a Fox film executive Alex Young in May of 2002, at which time Anderson again pitched his story for *AVP*.  Fox later authorized Anderson to write a screenplay based on his story.  SOF ¶ 16.

As the title indicates, Anderson's *AVP* story and characters were based in large part on the prior *Alien* and *Predator* works.  Anderson included an Antarctica setting, the pyramid idea from the 1976 *Alien* script and dialogue about ancient, lost civilizations beneath the ice, inspired in part by the 1969 book, *Chariots of the Gods*, by Erich von Däniken.  Anderson finished his first full draft screenplay for *AVP* on about August 29, 2002.  After making some revisions, Anderson delivered a draft to Fox and DEC for the first time about November 25, 2002.  His work was deliberately based upon the Fox-owned prior *Alien* and *Predator* works and the ideas

in the published works of Erich von Däniken.  The script that Anderson delivered to Defendant

Davis was written without any creative input from Fox, Davis or any other source.  SOF ¶¶ 14,

18.  Another writer, Shane Salerno, later revised some dialogue and characterizations.  Anderson

directed the film *AVP* which was released for public exhibition in the U.S. beginning in August

2004.  SOF ¶ 17.

### B.   Summary of the Subject Movie *Aliens v. Predator* ("*AVP*") (2004)

Unbeknownst to the humans in the story, young Predators from a distant galaxy have

determined to conduct one of their once-in-a-century hunts of Aliens on Earth.  They awaken a

Queen Alien who has been in a state of stasis for one-hundred years and begins laying eggs.

This activity has the intended effect of attracting humans to the remote site where they will

unwittingly serve as incubators for Aliens.  Charles Bishop Weyland, played by Lance

Henriksen, the wealthy owner of Weyland Industries, learns of mysterious pyramidal structures

beneath the ice of Bouvetoya Island, Antarctica when an orbiting satellite detects an unexpected

"heat bloom".  He assembles and heads a team of scientists and engineers who travel by

icebreaker to drill through 2,000 feet of ice. Unknown to the team, a spaceship located beyond

the moon and populated by alien Predators (as in Fox's 1987 and 1990 films) fires a beam at the

ice and burns a tunnel on a 30° angle.  The explorers climb down the shaft and discover a

pyramid with strange hieroglyphics containing a nest of Aliens (from Fox's *Alien* film) who use

humans as hosts to incubate their young.  The newborns are then hunted through the

underground complex both by Aliens and by hunter Predators, who come to earth for the sport.

As the humans are killed off, a female environmental scientist desperately teams with a surviving

Predator to battle the Alien queen.  The female protagonist, Alexa, is a determined, tough leader

(as is Ripley in Fox's *Alien* films).  She and the Predator trigger a bomb that kills all the

underground Aliens, and escape via the ice tunnel, continuing the battle in an abandoned whaling

station. They prevail, although the Predator is mortally wounded. In the end, a team of Predators

arrive to return the body of the Predator to his home planet.  The audience learns that the last

Predator has been impregnated with an Alien spawn.    SOF ¶¶ 18, 19.

**C.     Development of Plaintiff's *TLC* Screenplay**

Plaintiff wrote *TLC* in 1995, admittedly inspired in part by the book *Fingerprints of the Gods* (*FPG*) written by Graham Hancock, also published in 1995.  SOF ¶ 23.  *FGP*, in turn, draws upon the pool of pseudo-science also popular in von Däniken's books, such as *Chariots of the Gods*.  Rovin Decl., Ex. 50 at 29-30.  Before 1995, Plaintiff was aware of and viewed Fox's *Alien, Aliens* and *Predator* films.  SOF ¶ 24.

**D.     Summary of Plaintiff's Screenplay, *TLC***

In 1998, when plaintiff was attempting to submit his various screenplays and novels to potential buyers, he prepared a short brochure, Muller Depo., Ex. 32, in Petrich Dec., which he provided a one-paragraph summary of *TLC*.  It stated in relevant part:

> "THE LOST CONTINENT—When a college professor is recruited for an Antarctic exploration that reveals an ancient city beneath the ice, she also discovers fascinating and dangerous connections between the political power structure, the Freemasons and the lost civilization of Atlantis.  Can she escape from the eerie city with a team of Navy Seal's (sic) in time to stop a traitor in her group from delivering the secrets of the ancient world to the treacherous counsel of the Illuminati?  Find out by reading this blockbuster script! (S, N) ("Aliens" with intelligence and a pioneering new angle on the subject of Atlantis)."

TLC  opens around 10,000 BC. A very advanced civilization is wiped out by a gigantic earthquake.  In the present day, archaeologist Dr. Katherine Graham, 36, finishes her dig in Egypt and returns to her teaching and research post at Princeton.  She explains the controversial geological theory of crust displacement to her students. At the CIA, analysts believe their satellite imagery, picking up a heat bloom, may have detected something interesting underneath Antarctica.  Captain Bill Mitchell and his fast attack submarine are sent to investigate along with NSA agent Dave Dillon. They find a tunnel but the sub is too large to pass through the entrance. They retrieve a piece of metal near the tunnel entrance and return home.

Back in Washington, D.C., Captain Mitchell, also a Freemason, meets with Freemason leader Volker and tells him he thinks he may have located a civilization under Antarctica long sought by the Freemasons. Dillon tracks down Katherine and tells her they need her expertise for

a top secret mission. She is coerced into going when Princeton's Dean explains that Princeton's federal funding is at stake. Meanwhile, Volker meets with the US President, who is also a Freemason. Katherine meets with Dillon and his supervisor McCardle and they discuss entering the tunnel with the use of a small submarine that will be attached to the larger submarine.

Accompanying Katherine and Dillon will be Volker, Navy Seals Pittman, Conrad, Harper, Motley and Nugent, and Capt. Roessler. Katherine explains that Antarctica might be Atlantis, and that a huge seismic shift pushed the continent far from its original spot.

They board the *Sandshark*, the specialized miniature submarine, and head through the tunnel. They soon find themselves in the middle of a spectacular ancient city that is still intact. Katherine is certain this is Atlantis. They discover statues of seven evil looking gargoyle-like creatures. Katherine says they are the guardians of the city. Katherine also points out some imagery which is still used today by the Freemasons.

But then Conrad is mysteriously killed, and all seven evil statues vanish. Nugent and Pittman then battle two of the now animated statutes; Nugent survives, but Pittman is killed. Two of the seven creatures are killed.

On their way back to the sub, one of the creatures kills Harper. Another creature attacks Roessler. They open fire on it, but then another one kills Nugent. They make their way to a giant pyramid and come across thousands of Atlantean bodies frozen in a cryonic stasis. They see a crystal which seems to be bringing the frozen bodies back to life. Among those frozen is the Satanic Jahbulon, who we recognize as the leader from the opening scene in 10,000 B.C. Katherine pulls Dillon aside and tells him that she thinks Volker is a Freemason and may have a larger, secret agenda by being part of this mission.

Jahbulon reanimates. Volker is able to speak to Jahbulon in Jahbulon's own language and welcomes him back to life. Jahbulon kills Dillon with an energy burst from his finger. Motley

tries to kill Jahbulon but a creature kills him. Roessler and Katherine manage to escape. Katherine had removed a pack from Dillon's back, which contained a miniature atom bomb. As they look up they see the rest of the city of Atlantis is coming back to full power.  In the pyramid, Volker kills Jahbulon and takes control of the crystal, called the "Eye of Lucifer" that is said to give its possessor power over the world.

Volker catches up with Roessler and Katherine and tells them he killed Jahbulon. Volker tells them that long ago a few survivors got out of Atlantis, passed their secrets onto the Egyptians and then to the Freemasons. Volker also tells them that they cannot let the Atlanteans arise again, or they will take over the world. They meet up with Mitchell, but then Mitchell and Volker reveal that they are Freemasons and their goal was to get control of the crystal. They arm the atom bomb and depart in the mini-sub, abandoning Roessler and Katherine.

Katherine and Roessler go to the great pyramid, as Katherine believes there's a way to be transported back to the surface. Just before the bomb goes off,  a mysterious telepathic power transports them to a pyramid in Egypt. They return to the United States with the aid of NSA's McCardle, and, with NSA's approval, they set off a bomb that kills all of the Illuminati other than the President.  They give the NSA a phony replica of the crystal, keeping it for themselves. Six months later, Katherine has written a novel about her experiences, she and Roessler have fallen in love, and the crystal is hidden by Katherine in plain sight.  SOF ¶ 25.

## E.   Dissemination of *TLC*

Plaintiff claims that in the late 1990s, he sent copies of *TLC* to various production companies, including  to Corey Witte and to Todd Hoffman who worked at  independent production companies with offices at Defendant DEC.  In 1998, an agent Plaintiff was using sent TLC to "Fox 2000," a division of defendant Fox that was distinct and separate from the division that produced AVP.  SOF ¶ 26.

F.    Lack of Access to *TLC* by the Creators of *AVP*

      1.    No Access by the *AVP* Creator Paul Anderson

*AVP* was originally conceived and its screenplay written by Defendant Paul Anderson, the credited screenwriter and director.  SOF ¶¶ 3, 16-17.  Defendant Anderson denies ever hearing of Plaintiff or *TLC* before Plaintiff made his infringement claim. Plaintiff has no evidence of a submission to Anderson.  SOF ¶ 22.

      2.    No Access by Defendant Davis Entertainment Company

DEC was founded in 1986 by John Davis, its President. Davis has been a producer on at least 85 motion pictures.  He co-produced *Predator* and *Predator 2*, released respectively in 1987 and 1990.  From time to time, he has allowed independent producers to use some of DEC's office space, with the understanding that they will submit to him for his consideration any movie projects they wish to develop and produce.  None of them – including Corey Witte and Todd Hoffman, to whom Plaintiff claims he sent TLC – was ever employed by DEC, they were not authorized to enter into contracts for DEC and none of them provided TLC to DEC.   None of them had any involvement in any aspect of AVP.  DEC has never done business with Plaintiff or to Mr. Davis' knowledge ever received any literary material from Plaintiff.  SOF ¶ 21.

      3.    No Access by Fox Division  Twentieth Century Fox ("TCF")

In 1998, the Filmwriters Literary Agency submitted a copy of *TLC* to Suzie Moldavon at "Fox 2000," a separate division of Defendant Fox from TCF, the division of Fox that produced AVP after receiving Anderson's pitch and screenplay.  Ms. Moldavon never had any contact with Plaintiff or any discussions with the agency about TLC.  She never sent *TLC* to, or discussed TLC with, anyone at TCF.  Fox 2000 was a different division from TCF, with its own creative personnel, and was not involved in the development of AVP.[7]    SOF ¶ 20.

## III.   SUMMARY JUDGMENT STANDARDS

Rule 56(c) of the Federal Rules of Civil Procedure "mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence

---

[7]    The Second Circuit has rejected the "corporate receipt" theory of access.  *See Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 53 (2d Cir. 2003), discussed *infra* at 27.

of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In copyright infringement actions, summary judgment is mandated where the plaintiff cannot raise a genuine issue that defendants copied from or had "access" to his work or "appropriated" his copyright-protected expression. *See, e.g.*, *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (affirming summary judgment on lack of "substantial similarity" after assuming "access").

## IV.   THE COPYRIGHT CLAIM SHOULD BE DISMISSED

To establish a *prima facie* case of copyright infringement, plaintiff must present substantial evidence that it owns a copyright and that the defendants (1) actually copied (2) original, protected expression from the plaintiff's work. *Feist Publications, Inc. v. Rural Tele. Serv. Co.*, 499 U.S. 340, 361, 1115 S.Ct. 1282, 113 L.Ed.2d 358 (1991) ("Absent copying there can be no infringement of copyright."); *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996); *4 M. & D. Nimmer, Nimmer On Copyright*, ("*Nimmer*") § 13.01 at 13-4 to -6 (2010).

For purposes of this Motion only, Defendants assume that Plaintiff owns a valid U.S. copyright to Plaintiff's *TLC* script in the sense that the work has been registered and the copyright has not been assigned by the Author to third parties. 4 *Nimmer*, § 13.01[A] at 13-6 to -8. What remains to be determined is the issue of "copying" of protected expression - which requires that Plaintiff prove two distinct elements: actual copying and unlawful appropriation. *Porto v. Guiris*, 659 F. Supp. 2d 597, 608 (S.D.N.Y. 2009); 4 *Nimmer*, § 13.01[B] at 13-8 to -10.

The actual copying element focuses on "the factual question whether the defendant, in creating its work, used the plaintiff's material as a model, template, or even inspiration." 4 *Nimmer*, § 13.01[B] at 13-8 (emphasis added). Plaintiff raises no triable issue of copying because he fails to show the creator of *AVP*, Paul Anderson, had access to Plaintiff's *TLC* script and *AVP* has no similarity to *TLC* which is probative of copying.

Unlawful appropriation focuses on the legal issue of whether any alleged copying extended beyond unprotectible facts, concepts or ideas (17 U.S.C. § 102(b)) to plaintiff's

16

protectible expression - "the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Plaintiff's inability to show unlawful appropriation is manifest once the Court filters the portions of the works that are legally unprotectible, either because they are outside the ambit of copyright protection, or because they were indisputably created prior to, and independently of, plaintiff's work. Summary judgment is appropriate if the similarity between the two works "concerns only non-protectable elements" or "no reasonable trier of fact could find the works substantially similar." *Williams*, 84 F.3d at 587.

### A.   *AVP* Does Not Appropriate Protectible Elements of the Plaintiff's *TLC* Script

Even if a plaintiff is able to raise a triable issue of access or copying (which is not the case here), a copyright infringement claim still fails if the defendant's work is not substantially similar to protected expression in plaintiff's work (hereafter "substantial similarity").[8] *See ARC Music Corp. v. Lee*, 296 F.2d 186, 1976-88 (2d Cir. 1961); *Williams*, 84 F.3d at 587 (no infringement even if access is "conceded"); *Gottlieb Dev., LLC v. Paramount Pictures Corp.*, 590 F. Supp.2d 625, 631 (S.D.N.Y. 2008 (Chin, J.).

When, as in this case, non-identical works are compared, the "substantial similarity" inquiry involves a legal or policy issue: how far beyond the literal may plaintiffs' copyright monopoly extend? Courts "have an important responsibility in copyright cases to monitor the outer limits within which juries may determine" issues of fact such as substantial similarity. *Warner Bros., Inc. v. American Broadcasting Cos., Inc.*, 720 F.2d 231, 245 (2d Cir. 1983) ("*Warner Bros. II*"); 4 *Nimmer*, § 13.03[A][1] at 13-34 to -36. If a plaintiff were allowed to extend his monopoly too far, liability would be imposed for the "use" of unprotected ideas and facts – rather than protected expression – in violation of the First Amendment and copyright policy. *Feist*, 499 U.S. at 344-48, 349-50; *Harper & Row, Publishers v. Nation Enterprises*, 471 U.S. 539, 556, 85 L.Ed.2d 588, 105 S.Ct. 2218 (1985) (the idea/expression dichotomy strikes a constitutional balance between copyright and free speech interests).

---

[8]   *Feist*, 499 U.S. at 361 ("Not all copying, however, is copyright infringement.").

Where the works in issue consist of literary works such as screenplays, courts in this circuit have employed a substantial similarity analysis that requires the presence of either "fragmented literal similarity" or "comprehensive non-literal similarity." *Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366, 1372 (2d Cir. 1993) (referring to the two concepts as "localized similarity in language" and "global similarities in structure and sequence," respectively); . *See* 4 *Nimmer*, § 13.03[A].

In determining whether the similarities between works are substantial under this test, courts must decide "whether the similarities shared by the works are something more than mere generalized ideas or themes." *Warner Bros. Inc. v. American Broadcasting Co.*, 654 F.2d 204, 208 (2d Cir. 1981) ("*Warner Bros. I*"); *Smith v. Weinstein*, 578 F.Supp. 1297, 1303 (S.D.N.Y. 1984) ("the prison rodeo idea is not copyrightable . . . . Plaintiff's development of the rodeo as an escape vehicle is protectible, but only at a level that particularizes this general theme into characters, details, and events. At this level the similarities between his and defendants' work are insignificant.").

Storytelling in motion pictures necessarily relies on the use of facts, ideas, clichés, scénes-á-faire, conventions of story telling and filmmaking not original to its author. *Scénes á faire*, "unprotectible elements that follow naturally from a work's theme rather than from an author's creativity," *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 194 (2d Cir. 2004), are not protectible by copyright. *See Walker v. Time-Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986) (scenes that necessarily result from the choice of a setting or situation, and stock themes commonly linked to a particular genre, are *scénes á faire* not protected by copyright); *Williams*, 84 F.3d at 589 ("electrified fences, automated tours, dinosaur nurseries, and uniformed workers" are unprotectible *scénes á faire* in a story about a dinosaur zoo); *Zambito v. Paramount Pictures Corp.*, 613 F.Supp. 1107, 1112 (E.D.N.Y. 1985) ("[t]hat treasure might be hidden in a cave inhabited by snakes, that fire might be used to repel the snakes, that birds might frighten an intruder in the jungle, and that a weary traveler might seek solace in a tavern, all are indispensable elements to the treatment of 'Raiders' [of the Lost Ark's] theme, and are, as a

matter of law, simply too general to be protectible."). The Court must ignore any similarities consisting of such stock material or themes. A plaintiff's dramatic work is only protected from the comprehensive non-literal copying of its "story"[9] or "pattern,"[10] the original arrangement of characters, their relationships and the essential sequence of events. 4 *Nimmer*, § 13.03[A][l][b]; *Williams*, 84 F.3d at 588-91; *See* 4 *Nimmer*, § 13.03[A][1] & [2] at 13-36 to -43 & 13-53 to -59.

Usually, the substantially similarity issue is decided under the "average lay observer test," that is, "whether, in the eyes of the average lay observer, [defendant's work] is substantially similar to the protectable expression in [plaintiff's work]." *Williams*, 84 F.3d at 587; *Gottlieb Dev.*, 590 F.Supp.2d at 631. Application of that standard here, as it did in *Williams*, would result in dismissal of the claim.

However, the comparison is even more favorable to Defendants because in comparing works that contain unprotectible elements, the Court "must attempt to extract the unprotectible elements from . . . consideration and ask whether the protectible elements, standing alone, are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995); *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 101 (2d Cir. 1999). *Williams*, 84 F.3d at 588 (affirming summary judgment). In other words, the ordinary observer's inspection "must be more 'discerning', ignoring those aspects of the work that are unprotectable." *Laureyssens v.The Idea Group, Inc.*, 964 F.2d 131, 141 (2d Cir. 1992); *Porto v. Guiris*, 659 F.Supp.2d 597, 609-610 (S.D.N.Y. 2009) (applying "more discerning" test to compare two fictional accounts of a modern trial of Judas Iscariot and grant summary judgment); *Lewinson v. Henry Holt & Co.*, 659 F.Supp.2d 547, 564-

---

[9]   Regarding non-identical dramatic works, Judge Hand explained in *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930), *cert. denied*, 282 U.S. 902 (1931):

> Upon any work, … a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. … but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

[10]   Professor Chafee famously further refined the boundary between idea and expression, stating that "protection [of a dramatic work] covers the 'pattern' of the work … the sequence of events and the development of the interplay of characters." Z. Chafee, *Reflections on the Law of Copyright*, 45 *Colum.L.Rev.* 503, 513 (1945) quoted in *Williams*, 84 F.3d at 588.

66 (S.D.N.Y. 2009) (applying "more discerning" test in comparing two children's books to grant summary judgment).

Additionally, where a defendant's work is an authorized sequel or prequel to prior works, in addition to filtering out claimed similarities that refer to facts and ideas, the defendant's prior or licensed work should also be filtered out, because, as the Sixth Circuit has observed, it is not a reasonable inference that a party would prefer "the illicit thrill of copyright infringement, to copy wrongfully from another what he could copy from himself." *Murray Hill Pubs., Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 325-27 (6th Cir. 2004) (reversing judgment on jury verdict and directing judgment for defendant). Another legal doctrine – merger – has application here. A copyright infringement claim cannot rest on similarities that result from a limited range for the expression of an idea. *CCC Information Serv., Inc. v. McLean Hunter Market Reports, Inc.*, 44 F.3d 61, 68 (2d Cir, 1994). Because *AVP* is a sequel and prequel to *Alien* and *Predator*, in order to satisfy their fan base, *AVP* must necessarily use elements, props and references which form the DNA of those works. SOF ¶¶ 14, 18.

In comparing a written story to a movie, the Second Circuit "examines the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace and settings." *Williams*, 84 F.3d at 588. The works themselves are the best evidence.[11]

### 1.    No Substantial Similarity As To Themes

The theme of *AVP* is that, when pitted against advanced extraterrestrials, only humans with extraordinary resourcefulness, courage and/or luck will survive (this is also a theme of the five prior *Alien/Predator* films).

The theme of *TLC* is that ancient mystical powers of Atlantis can control the world; conspiracies by persons in high places to gain control of those powers can be defeated by persons who discover how to use those mystical powers.

---

[11]    *Walker v. Time-Life Films, Inc.*, 784 F.2d 44, 52 (2d Cir. 1986) ("in copyright infringement cases the works themselves supersede and control contrary descriptions of them.").

### 2.     No Substantial Similarity As To Characters

Although both works include protagonists and antagonists, such generalized "character types" which would appear in any "action-packed" movie are not protected by copyright law.  *Warner Bros II.*, 720 F.2d at 240; *Nichols*, 45 F.2d at 119. (Hand, L.); *Littel v. Twentieth Century Fox Film Corp.*, 1995 WL 404939, at * 14, 17 (S.D.N.Y. 1995) (summary granted regarding *Predator* movies because only similarities were too general).  The characters in the Movie are sharply distinguished from those in *TLC* by their distinctive back-stories, personalities, and challenges in armed conflict.

The fact that characters exhibit similar traits does not necessarily support infringement, because they may exhibit them for different reasons, and exhibit those attributes in different ways.  In *Denker v. Uhry*, 820 F.Supp. 722, 735 (S.D.N.Y. 1992), *aff'd*, 996 F.2d 301 (2d Cir. 1993), the court found that Daisy in the movie *Driving Miss Daisy*, though cantankerous, was not substantially similar to the cantankerous Horowitz in the play *Horowitz and Mrs. Washington*, because the origin and expression of the trait were different in the two characters.

Other than the Aliens and Predator, most of the characters in the two works are not well developed.  Where a character alleged to be infringed is not sufficiently developed, no claim of character infringement can be made.  *Jones v. CBS, Inc.*, 733 F.Supp. 748, 753 (S.D.N.Y. 1990).

Notably, there are no Aliens or Predators in TLC.  As their names in the movie titles suggest, those characters really are the story.  The Alien may be one of sci-fi's scariest creatures, with dripping elongated jaws and an insect-like body who kills its prey by latching a scorpion-like spawn over the host's face, quietly incubating a fetal Alien inside the host's body, which suddenly bursts out of the host's chest in a fatal, bloody birth.  Predators are stoic, deadly warrior-aliens who live for the hunt, using thermal imaging to hunt and kill their prey.

Plaintiff's Amended Complaint, ¶¶ 28, at 9-15 draws what he claims to be similarities in the characters in each work.  Plaintiff compares most at the level of idea, not expression, misdescribes the characters and ignores the obvious indebtedness of *AVP* to its predecessors.

Plaintiff compares *TLC*'s Dr. Katherine Graham with *AVP's* Alexa Woods.  Other than being female they are quite different.  Alexa is a precursor of the strong women protagonists in the sequel *Alien* and *Aliens*.  SOF ¶¶ 39-40.  She does not become romantically involved with anyone, but she forms an alliance with one of the Predators in order to survive.  Dr. Graham is a college professor who is the love interest of the Navy SEAL team leader.

Plaintiff compares the teams formed in both works for the expedition to the Antarctic.  This is an "idea" and a *scénes-á-faire*.  Most expeditions to the Antarctic are group efforts.  They are different in that in *AVP* the team is duped by Predators into traveling to Antarctica to serve as hosts to baby Aliens, so the Predators will have something to hunt.  The team in *TLC* is run by government leaders who know perfectly well they are in search of a powerful crystal that is of value to the Freemason Illuminati.  The leader in *AVP*, Weyland, is a precursor to the exploration firm in the *Alien* and *Aliens* movies, set generations later, who is pre-occupied with his legacy (The Weyland-Yutani Corporation in *Alien* and *Aliens* is obviously named after him).  The "leader" in *TLC*, McCardle, is an NSA supervisor who stays in Washington D.C.

Plaintiff compares the Alien Queen in *AVP* with the Atlantean King in *TLC*.  The Alien Queen is a monstrous insect-like creature, kept in stasis by the Predators for 100 years until they are ready to hunt.  The Queen does as insect queens do; she hatches Alien offspring  that attach to and kill humans.  The Satanic *TLC* King, Jahbulon, is a human being, a former king of the Atlanteans when their world was frozen.  He is the custodian of the crystal, the "Eye of Lucifer."

Plaintiff compares the Alien creatures with *TLC* creatures called Baphomets.  Of course, the Aliens are the same characters from the prior Fox works and could not possibly infringe Plaintiff's Baphomets.  Plaintiff compares the Predators in *AVP* with the *TLC*'s SEALs leader Roessler.  Again, the Predators are the same types of Predators from the previous two movies and could not infringe *AVP*.  Their main purpose is to fight Aliens to gain their entry into adulthood.  Roessler has no such purpose; he was tricked into the expedition.

The rest of Plaintiff's comparisons focus on attributes common to an action adventure genre and thus compare ideas and stock characters, not protected expression.

### 3.    No Substantial Similarity As To Settings

*AVP* is set in Nebraska, Nepal, Mexico, Antarctica and outer space.  *TLC* is set in Egypt,

Princeton, New Jersey, Antarctica and the Washington, D.C. area.  Both works require a place

which is nearly uninhabitable so that it could not be readily discovered.  Each author chose to set

the main action in a pyramid like structure under an ice cap in or near Antarctica.  This is an

unprotectable idea.  In *AVP*, it is drawn from the reference to an icy Siberian locale in the *AVP*

1991 comic book, *Predator: Cold War.*  SOF ¶ 12.  It also flows naturally from Von Däniken,

from the reference to the Aliens' pyramid in the 1976 *Alien* script and from the need to locate the

action in such a remote location that the humans in the *Alien* sequels will still be surprised to

discover Aliens more than a century later.  SOF ¶18.  In TLC, the location is explained as the lost

continent of mythical Atlantis, displaced by a shift of the tectonic plates.

### 4.    No Substantial Similarity As To Plot and Sequences of Events

The plots of *AVP* and *TLC* are summarized at pages 11 and 12-14, *supra*.  These

summaries demonstrate that, despite the common presence in the works of elements in the nature

of scénes-á-faire, and elements attributable to the *Alien/Predator* provenance of *AVP*, the

remaining elements of similarity would not cause any reasonable lay observer to consider the

works as a whole substantially similar to one another, as required by copyright law.  *Williams*, 84

F.3d at 589-90; *Walker v. Time-Life*, 784 F.2d at 50.

### 5.    No Substantial Similarity As To Dialogue

The language of the two works has little more in common than the occasional generic

English phrase or scientific term associated with exploration (e.g., "heat bloom" for hot spots

detectable from space).[12]  See FAC ¶ 33.  Short or ordinary phrases are not entitled to copyright

protection.  *See, e.g.*, *Southco, Inc. v. Kanebridge Corp.*, 390 F. 3d 276, 285-87 (3rd Cir. 2004);

*Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989); *Zambito v. Paramount Pictures*, 613

---

[12]    The term "heat bloom," cited by Plaintiff as a "similarity" was in usage prior to the *AVP* screenplay (and the 1995 *TLC* script), as for example, in the 1990 movie *Hunt For Red October* to refer the heat generated by a secret submarine sensed by a passing satellite. SOF ¶ 33.  In addition, Anderson was inspired by the reference to the infrared "heat" signature of the Predator ship detected by government satellites in the 1991 *AVP* comic, *Predator: Cold War.*  Anderson Dec. ¶ 15.

F.Supp. 1107, 1112 (E.D.N.Y. 1985) *aff'd*, 788 F.2d 2 (2d Cir. 1985).  Similarly, where there are similarities that result from the use of customary language and sentence structure, they do not support a finding of substantial similarity in dialogue.  *Green v. Lindsey*, 885 F.Supp. 469, 488 (S.D.N.Y. 1992) *aff'd*, 9 F.3d 1537 (2d Cir. 1993).

### 6.        No Substantial Similarity As To Pace Or Mood

Elements of mood and pace that are "common to [a] genre", such as "action-adventure", are unprotectible and "do not demonstrate substantial similarity."  *See Olson v. National Broadcasting Co.*, 855 F.2d 1446, 1451 (9th Cir. 1988).  The pace and mood of *AVP* are essentially the same as found in the earlier *Alien* and *Predator* films, including the suspense created by the killing of human crew members, one-by-one, by the Aliens or Predators.  Beyond generic similarities attributable to action-adventure films, the two works are different in mood and pace because they are different stories with different themes.

### 7.        No Substantial Similarity As To Overall Concept And Feel

The overall concept for *AVP* is that a team of heavily armed humans are lured to a reanimated pyramid under the Antarctic ice as part of a conflict between two different kinds of extraterrestrials.  All of the humans are killed, except for the woman guide, Alexa, the team leader for the expedition who survives by joining forces with a Predator.

The overall concept of *TLC* is that of a conspiracy between the Illuminati of the Freemasons and the United States government to rule the world with aid from a crystal that powered the ancient lost civilization of Atlantis.  The plot is foiled by a female archaeologist and her Navy SEAL love interest.

### 8.        Lists Of Purported "Similarities" Such as Plaintiff's Cannot Raise A Triable Issue

Side-by-side lists of random elements and abstractions such as those found in Plaintiff's list of alleged "similarities," FAC, ¶¶ 28-32, are "inherently subjective and unreliable" and insufficient to raise a genuine issue as a matter of law.  *Williams v. Crichton*, 84 F.3d at 590, quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).  "Such a scattershot approach … fails to address the underlying issue of whether a lay observer would view the works

as a whole substantially similar to one another." *Williams*, 84 F.3d at 590.  Although a party cannot escape liability where part of its work admittedly infringes, by noting that other parts are different, "nevertheless, differences between the two works are relevant to the question of substantial similarity because 'numerous differences tend to undercut substantial similarity.'" *Porto*, 659 F.Supp.2d, at 609, quoting *Warner Bros II*, 720 F.2d at 241.

### 9.    Application of the Test for Fragmented Literal Similarity

In order to find "fragmented literal similarity," or "localized similarity in language," between *AVP* and *TLC*, it would be necessary to find verbatim reproduction, or close paraphrasing, of language.  *See Warner Bros II*, 720 F.2d at 242.  An examination of plaintiff's similarity claims demonstrates that there is simply no fragmented literal similarity to be found beyond the mere common usage of ordinary words in the English language.  There is neither verbatim reproduction, nor close paraphrasing.

Plaintiff has sprinkled throughout his Amended Complaint random ideas which he claims are substantially similar and taken from *TLC*.  Even though not protectible, the Charts (Exhibits 43 and 50 to the Petrich Declaration) show that many ideas in *AVP* are derived from *Alien* and *Predator* and von Däniken works.

### B.    Because Plaintiff Cannot Raise a Genuine Issue As To The Element Of Actual Copying, Summary Judgment Should Be Entered For Defendants

Even if a defendant's work is identical to a plaintiff's work, no infringement exists unless the similarities resulted from actual copying of plaintiff's work.  *Mazer v. Stein,* 347 U.S. 201, 218, 98 L.Ed. 630, 74 S.Ct. 460 (1954).  See also *Feist*, 499 U.S. at 345-46; 4 *Nimmer*, § 13.01[B] at 13-9.

Without direct evidence of copying, an inference of copying may arise if Plaintiff shows that the creators of Defendant's Work had "access" to Plaintiff's work, and the two works share similarities that are probative[13] of copying.  *Jorgensen*, 351 F.3d at 51.

If Plaintiff cannot establish "access," the actual copying element can only be established

---

[13]    The difference between "substantial similarity" and "probative similarity" is explained in *Porto v. Guirgis*, 659 F.Supp.2d 597, 608 & n.3 (S.D.N.Y 2009).

if defendant's work is so "strikingly similar" to Plaintiff's work as to preclude even the possibility that Defendants' work was created independently of Plaintiff's work.  *Id.*, at 56; *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997).

Defendant may rebut an <u>inference</u> of copying by proving his work was created independently of Plaintiff's work.  *Maharam v. Patterson*, 2010 WL 827088  (2d Cir. 2010) (explaining *Repp v. Webber*).

### 1.    <u>Plaintiff's Supposed Evidence of "Access" and "Probative Similarity" Is Too Speculative And Conjectural to Raise An Inference Of Actual Copying</u>

To raise a genuine issue of "access," Plaintiff must present substantial evidence – not speculation or conjecture – that the creators of the *AVP* movie had a "reasonable opportunity to view" Plaintiff's *TLC* script before they finished creating the Movie.  *Jorgensen*, 351 F.3d at 51. A "bare possibility" of access is insufficient.  *Id.*; 4 *Nimmer* § 13.02[A] at 13-21 & n.19. ("Access may not be inferred through mere speculation or conjecture.")

### (a)    <u>No Access By Public Dissemination</u>

Access is sometimes inferred where Plaintiff's work is disseminated widely and publicly. "Widespread dissemination" means considerable commercial success or availability in the marketplace.  *Mowry v. Viacom Intl., Inc*., 2005 WL 1793773 at *4-5 & n.7 (S.D.N.Y. 2005). Plaintiff's script was never published or publicly displayed.

### (b)    <u>No Access Through Intermediaries</u>

To raise a triable issue that the creators of *AVP* had access to *TLC* through intermediaries, Plaintiff must show more than that there was a "nexus" between third parties who received a copy of *TLC* and the Movie's creators which makes it a fair inference that a third party disclosed the contents of *TLC* to the Movie's creators.  Plaintiff cannot show that any such third party was able to transmit "protectible expression" from *TLC* to the Movie's creators or to contribute such expression to the Movie.  *Meta-Film Assocs., Inc. v. MCA, Inc*, 586 F.Supp. 1346, 1355-56 (C.D.

Cal. 1984) (granting summary judgment for defendants).[14]

Plaintiff does not claim to have sent a copy of *TLC* to the screenwriter and director of *AVP*, Paul Anderson, and Anderson denies any knowledge of *TLC*.  SOF ¶ 22.

There is no evidence that Defendant DEC received a copy of *TLC*.  Fox 2000 – a different division of Defendant than the unit that produced *AVP* – did receive a copy of *TLC* from plaintiff's agent in 1998.  SOF ¶ 21 (four years before Anderson pitched his *AVP* story to Fox).  However, the evidence is that neither the Fox 2000 division nor the *TLC* script had any involvement in the development or making of the *AVP* Movie.  SOF ¶ 20.  Legally, courts have rejected the claim that access by creators may be inferred from "corporate receipt."  *See Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 53 (2d Cir. 2003) (rejecting corporate receipt doctrine); *Jones v. Blige*, 558 F.3d 485, 492-93 (6th Cir. 2009).

Plaintiff also claims that copies of his *TLC* script were submitted to two persons employed by two independent companies who had office space at defendant Davis Entertainment Company, but none of them gave anything to DEC about *AVP* or was "in a position to transmit [plaintiff's work] to the [creators], … a supervisor with responsibility for the defendant's project, … part of the same work unit as the [creators], or [one who] contributed creative ideas or material to the  defendant's work."  *See Meta-Film Associates, Inc. v. MCA, Inc.*, 586 F.Supp.1346, 1355-56 (C.D. Cal. 1984).  Neither they nor their production companies are credited on the *AVP* movie.  It is Plaintiff's burden to produce evidence not only of submission to third parties but also of what happened with the submission.

> Beyond having her evidence of delivery of 'Concealed' to Mr. Cosford, Mr. Manders and the members of her committee and Mr. Cosford's social acquaintance with Mr. Sayles credited, Plaintiff is 'entitled to no presumption or assumption as to what happened to the materials after submission; that is something on which [she] must offer sufficient evidence under Anderson and Celotex.' *Takeall v. Pepsico, Inc.*, 809 F.Supp. 19, 22 (D. Md. 1992, *aff'd* 14 F.3d 596 (4th Cir. 1993).

*Herzog v. Castle Rock Entertainment*, 193 F.3d 1241, 1252 (11th Cir. 1999) (affirming summary

---

[14]   *Meta-Film*  is recognized as the leading federal authority on "access through intermediaries."  *See e.g.*, *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 52 (2d Cir. 2003); *Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996).

judgment).  Plaintiff cannot satisfy either burden in this case.

**(c)      No "Probative Similarities"**

As none of the similarities indicates copying from *TLC*, no inference of copying exists.

Probative similarities are similarities that would not be expected to arise if the works had been

created independently.  *Porto*, 659 F.Supp. 2d at 608-09.  Anderson was deliberately writing

*AVP* to fit within the *Alien* and *Predator* franchises.  Plaintiff admittedly intended his *TLC* to be

"'Aliens' with intelligence," quoted *supra* at 12.   Some similarity could be expected to arise

without *AVP* having copied from *TLC*.  Defendants anticipate Plaintiff will offer alternative

opinions of Professor David M. Yerkes ("Yerkes") that his comparison of words found in *TLC*

and the first draft and final shooting scripts of *AVP* reveals similarities probative of actual

copying, either *TLC* from *AVP* or  *AVP* from *TLC*, or both from a prior common source.

However, Professor Yerkes' opinion as reflected in the Expert Report is inadmissible under

Federal Rules of Evidence 702 and 403 and the standard set by *Daubert v. Merrell Dow

Pharmaceuticals*, 509 U.S. 579, 113 S.Ct.2786, 125 L.Ed. 2d 469 (1993) and related case law.

Yerkes' opinion is so equivocal it will not assist the trier of fact to understand or determine a fact

in issue; his methodology[15] (comparing similar words, not characters or story, nor even

paragraphs or phrases) is not the product of reliable principles reliably applied; he lacks relevant

expertise; and probative value of his proffered testimony, if any, is greatly exceeded by its

potential prejudicial impact.

**2.      The Evidence Of Independent Creation Of the New Matter In The
Movie Overcomes Any Alleged Inference of Actual Copying**

Even if Plaintiff could raise an inference of actual copying by a combination of access

and similarities that indicate copying, the inference may be overcome on a motion for summary

judgment by uncontroverted evidence of independent creation which, as shown in the discussion

of undisputed facts, is overwhelming in this case.  <u>See</u> Charts in Petrich Dec., Ex. 43 and

---

[15]    For example, his Report equates "futuristic sea vessel" from page 1 of *TLC* with "futuristic
craft … spaceship" from page 44 of Anderson's October 18, 2002 *AVP* script.

28

Montage referenced in Gillham Dec., Ex. 24.  *See* Fed.R.Ev. 301; *Calhoun v. Lillenas Publ'g,* 298 F.3d 1228, 1236 (11th Cir. 2002); *Keeler Brass Co. v. Continental Brass Co.,* 862 F.2d 1062, 1066 (4th Cir. 1988);; *Nunley v. City of Los Angeles,* 52 F.3d 792, 796 (9th Cir. 1995) (discussing "bursting bubble" presumptions) .  Where there are independent sources to corroborate that Defendants work was created independently of Plaintiff's work, such evidence will overcome any rebuttable inference of actual copying.  *Maharam v. Patterson,* 2010 WL 827088 (2d Cir. 2010) (explaining *Repp v. Webber*).

In this case, it is undisputed that the creators of *AVP* relied on the characters, plot devices, setting, and themes found in *Alien* and *Predator* franchises – undeniable evidence that the sources of *AVP* were Fox's prior works, all created independently of Plaintiff's *TLC*.  *AVP*'s pyramid setting, hieroglyphics, and statues come from the cut scenes and artwork for the 1979 *Alien*; *AVP*'s icy location and the satellite station picking up a "heat" signal on Earth come from Fox's 1991 *Predator: Cold War* comic book; *AVP*'s reluctant heroine comes from Fox's 1986 <u>*Aliens* movie</u>.  *AVP*'s location of a subterranean ancient civilization near Antarctica was inspired by the necessity of locating the action at a remote place on Earth so that the titanic battle would go undetected by civilization and thus mesh with the conceit that the Alien creatures would remain unknown to surprise human generations later in the *Alien* movie.  Anderson Dec., ¶26.  It is not a permissible inference to assume that Anderson, Fox and DEC, with their purposeful attempt to fit a sequel/prequel within the Fox franchises would copy the same or even similar material from a third party.  *Murray Hill*, 361 F.3d at 325-27, discussed *supra* at 20. As for the pyramids and the Antarctica location present in Anderson's early script, both were written by Anderson before he had any input from Fox or DEC.   He never heard of Plaintiff or his works.  Additionally, both Giger's drawings of pyramids in the Book of Alien,  intended for but not used in the 1976 *Alien* movie, and von Däniken's discussion of pyramids designed by aliens from outer space in "Chariots Of The Gods" were inspirations to Anderson for the pyramids in AVP.  Anderson Dec. ¶¶14, 22.

## V.     THE BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED

### A.     The Allegations

The alleged basis for Plaintiff's second cause of action for breach of implied contract is: (1) that he allegedly "provided *TLC* to Defendant Davis Entertainment Company and to Fox 2000 at their request with the implied promise that said entities would pay for any use of Plaintiff's ideas or *TLC*," and (2) that the Defendants allegedly "used Plaintiff's ideas as the basis for *AVP* but Defendants failed to pay Plaintiff for their use of Plaintiff's ideas."  FAC ¶¶ 49-54 (emphasis added).[16]

### B.     Plaintiff Has No Evidence To Support The Contract Claim

#### 1.     No Privity Between Plaintiff and Anderson and DEC

Plaintiff has not alleged that he made a solicited submission to Anderson.  He has no evidence of a submission of *TLC* to Defendant DEC.  SOF ¶ 41. Thus, Anderson and DEC are entitled to a dismissal of this claim for lack of privity, for that reason alone, although all the other defenses noted below are applicable to them.

#### 2.     No Mutual Assent

To establish an implied-in-fact contract, Plaintiff must show that "the agreement and promise have simply not been expressed in words," and that the "court may justifiably infer that the promise would have been explicitly made, had attention been drawn to it."  *Maas v. Cornell Univ.*, 94 N.Y.2d 87, 93-94, 699 N.Y.S.2d 716 (1999).  There must also be admissible evidence to establish "the other elements necessary to find a valid . . . implied-in-fact contract . . . *e.g.*, mutual assent."  *Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir. 2000) (applying New York implied in fact contract law). There is no evidence that Plaintiff had any communications with Fox or any other Defendant regarding his screenplay or his ideas.

#### 3.     No Certainty As To Material Terms

---

[16]   Without explanation, although Plaintiff's initial Complaint alleged the use of his submitted script, his amended Complaint alleges in addition that defendants promised to pay for the use of ideas.

A material element of Plaintiff's alleged claim is that Defendant Fox promised to pay for use of *TLC* or its ideas.  However, because Plaintiff has no evidence of communications with any defendants about compensation, several material terms of his alleged contract are missing: (1) no promise to pay for ideas, rather than the script; (2) no agreed compensation or duration of license.  All defendants are entitled to dismissal for this reason alone.  *Saunder v. Baryshnikov*, 110 A.D. 2d 511, 512, 487 N.Y.S. 2d 51 (1985) (secretary's claim against employer for breach of alleged promise to "take care of her and her financial needs for the rest of her life" too vague.); *Baer v. Chase*, 392 F.3d 609, 619-21 (3d Cir. 2004) (applying implied in fact contract law of New Jersey, summary judgment for defendant creator of "The Sopranos" even though the parties agreed that plaintiff would be compensated for assisting the producer, no enforceable contract because compensation and duration of services were uncertain).

Custom will not fulfill a missing term of a contract.  *Markogianis v. Burger King Corp*., 1997 WL 167113 at *5-6 (S.D.N.Y. 1997) (applying New York laws to implied contract claim; denying industry-wide custom to pay for ideas); *Grombach Productions, Inc. v. Waring,* 293 N.Y. 609, 615-16, 59 N.E.2d 425 (1944) (where no assent to an unsolicited disclosure, custom could not create a contract).

## C.   Independent Creation/No Use

No liability arises unless the defendant has used the idea that was actually submitted to that defendant.  Conversely, if the idea used by defendant was developed independently of plaintiff or acquired from someone else, no liability arises to plaintiff.  *Downey v. General Foods Corp*., 37 App.Div.2d 250, 254, 323 N.Y.S.2d 578 (1971), *rev'd on other grounds*, 31 N.Y.2d 56, 286 N.E.2d 257 (1972).  See *McGhan v. Ebersol*, 608 F.Supp. 277, 286 (S.D.N.Y. 1985) (no appropriation of ideas "unless the ideas are actually used by a defendant.")

**No Actual Use**.  As with copyright infringement, an idea purveyor may create a triable issue of actual use by circumstantial evidence of access and probative similarity.  4 *Nimmer*, § 19D.07[C][1][b] at 19D-89 to -90.

**No Actionable Use**.  In a true contract for the use of ideas, a Plaintiff does not have to

show that <u>protected expression</u> was taken.  However, Plaintiff must show that a material portion of the Plaintiff's <u>novel</u> ideas were taken.  *Nadel*, *supra*.

No liability for the use of "ideas" arises under an implied in fact contract unless the "ideas" are novel to the "buyer."  *Nadel*, 208 F.3d at 380.  Plaintiff cannot claim novelty for ideas that are publicly known, "a variation on a basic theme," or "a mere adaptation or natural progression of the concept of linear plot sequence which was in existence at the time of its proposal."  *Oasis Music, Inc. v. 900 USA, Inc.*, 161 Misc.2d 627, 631-33, 614 N.Y.S. 878 (1994).  Plaintiff does not allege and he cannot show that any ideas in *AVP* are "novel" and originated by Plaintiff.  Clearly all the *Alien* and *Predator* ideas, including pyramids as a location for Aliens, were known to their owner, Defendant Fox.  The ideas in von Däniken's books, including pyramids and Antarctica, were widely published and well known to Defendant Anderson, and he had no agreement with Plaintiff.  SOF ¶¶ 41-42; Anderson Dec., ¶¶ 14, 22.

The obverse of actual copying is independent creation.  *Hollywood Screentest of America, Inc. v. NBC Universal, Inc.*, 51 Cal.App.4th 631, 646-48, 60 Cal.Rptr. 279 (2007) (affirming summary judgment of independent creation).  Here, the uncontroverted evidence is that Anderson, who had no contract with Plaintiff, independently created and submitted his script to Fox, and Fox used that story.  Defendants have also shown independent creation <u>by creating a sequel/prequel based on *Alien*</u> and *Predator*  <u>works which existed before Plaintiff created his TLC script.</u>  This uncontroverted evidence overcomes any inference that Plaintiff might claim arises from any access and any similarity.  See *Paul v. Haley*, 183 A.D.2d 44, 56, 588 N.Y.S.2d 897 (N.Y. App. Div. 1992); *Hollywood Screentest of America, Inc.*, 51 Cal.App.4th at 646-48.

### C.    <u>Plaintiff's Contract Claim Is Substantially Equivalent To Copyright Claims And Preempted By The U.S. Copyright Law</u>

Alternatively, Plaintiff's claim for breach of implied contract claim is preempted under federal copyright law, and thus should be dismissed.  Section 301(a) of Copyright Act states, in relevant part:

[A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of

authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title.  Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State. (Emphasis added.)

17 U.S.C. § 301(a).  (Emphasis added.)  Section 106 of the Copyright Act grants a copyright owner the exclusive right to reproduce the copyrighted work, prepare derivative works, distribute copies to the public, perform the copyrighted work publicly, and display the copyrighted work publicly.  17 U.S.C. § 106(1)-(5).

The "complete preemption doctrine" extends to the Copyright Act and "both preempts state law and substitutes a federal remedy for that law, thereby creating an *exclusive* federal cause of action."  *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) (emphasis added).  The Second Circuit distinguishes between state law causes of action that "would infringe one of the exclusive rights" protected by federal copyright law, and state law causes of action that "incorporat[e] elements beyond mere reproduction or the like" and thus, where the federal and states rights "are not equivalent."  *Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 200 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985).  Thus, the question becomes a matter of whether the state law causes of action are functionally equivalent to the rights protected by the Copyright Act, and thus are preempted.

A state law cause of action is preempted by the Copyright Act if:

(1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights already protected by copyright law under 17 U.S.C. § 106.

*Briarpatch Ltd., L.P.*, 373 F.3d at 305 (citation omitted).

The subject matter requirement is met here because "the claim applies to a work of authorship [including] … literary works and motion pictures."  *Id.  See also* 17 U.S.C. § 102(a). Even though Plaintiff alleges a contract for the use of the unprotectible "ideas" embedded in his

allegedly submitted screenplay,[17] "Copyrightable material often contains uncopyrightable elements within it, but section 301 preemption bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements." *National Basketball Assn v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997).

State law claims fall within the ambit of rights protected by the Copyright Act when they "involve acts of reproduction, adaptation, performance, distribution or display. Further, [to be preempted,] the state law claim must not include any extra elements that make it qualitatively different from a copyright infringement claim. . . . Moreover, we take a restrictive view of what extra elements transform an otherwise equivalent claim into one that is qualitatively different from a copyright infringement claim." *Briarpatch*, 373 F.3d at 305-06 (citations omitted). The single state law claim here, in essence, is just a different way of pleading that the Fox Defendants allegedly used Plaintiff's screenplay without obtaining his permission and infringed.

Courts find that breach of implied contract claims are preempted by copyright law where, as here, the contract claim is based on an allegedly unauthorized use of plaintiff's copyrighted script  *See  Arpaia v. Anheuser-Busch Companies, Inc.*, 55 F. Supp. 2d 151, 162 (W.D.N.Y. 1999) (where implied breach of contract claim was based on defendants' alleged use of "copyrighted works," it was preempted by federal copyright); *Markogianis v. Burger King Corp.*, 1997 WL 167113, at *5-6 (S.D.N.Y. 1997) (where plaintiff tried to assert breach of implied contract claim based on  defendant having received plaintiff's written proposal, "such allegations do not present a qualitatively different cause of action than copyright infringement"); *Wolff v. Inst. of Elecs. & Elec. Eng'rs, Inc.*, 768 F. Supp. 66, 69 (S.D.N.Y. 1991) (finding preemption where alleged breach of contract was infringement of exclusive copyright). *Smith v. New Line Cinema*, 2004 WL 2049232 (S.D.N.Y. 2004) (Chin, J.) is squarely on point. There, the plaintiff alleged that he wrote an original screenplay, which he submitted to a subsidiary of

---

[17]    There is no evidence here that Plaintiff attempted to submit his ideas separately from his script or that he conditioned submission of his copyrighted script on a promise to pay for the use of ideas.  If a promise to pay for <u>ideas</u> is implied <u>by law</u>, the implied in law  contract is preempted.  *Briarpatch*, 373 F.3d at 306-07.

New Line Cinema ("New Line").  When defendants' movie,  "The Cell," was released, plaintiff

sued for copyright infringement and breach of implied contract.  This court dismissed the

implied in fact contract claim:

> Smith's claim for breach of implied contract is based on the same allegations
> underlying his copyright claim:  defendants' failure to compensate and credit him
> for the alleged unauthorized use of his original screenplay. . . .  The subject matter
> of Smith's state law breach of contract claim falls squarely within the subject
> matter of copyright laws.  Additionally, Smith's state law right to receive credit
> and compensation for the alleged unauthorized use of his screenplay is equivalent
> to the exclusive rights protected by federal copyright law.  Accordingly, Smith's
> breach of implied contract claim is preempted by the Copyright Act and is
> therefore dismissed.

*Id.* at *4-5 (citations omitted).

To the extent that Muller asserts an implied contract at all, it is based solely on his

providing *TLC* to Fox 2000 on his uncommunicated assumption that there was an "implied

promise" that Fox would pay for the use of *TLC* or its ideas.  FAC ¶ 49.  Plaintiff's unilateral and

unexpressed "hopes" and "expectations" that Defendants' would promise to pay for ideas (as

distinguished from being bound by copyright law) does not create mutual assent . See *A Slice of

Pie Prods., LLC v. Wayans Bros. Entert.*, 487 F.Supp.2d 41, 51-52 (D. Conn. 2007) (applying

California law).  Even if the receipt by Fox of the *TLC* script implied a promise not to infringe

the copyright in the script, that implied agreement would be preempted.  *Selby v. New Line

Cinema Corp.*, 96 F.Supp.2d 1053, 1059-62 (C.D. Cal. 2000).  Because Muller cannot present

evidence of an "extra element" to transform his "otherwise equivalent claim into one that is

qualitatively different from a copyright infringement claim," *Briarpatch*, 373 F.3d at 305, the

implied contract claim is preempted by federal copyright law.

## V.    CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that summary judgment

be entered in their favor on all claims against them.

DATED: June 14, 2010                    _____/s/ Louis P. Petrich_____
                                        LOUIS P. PETRICH (*pro hac vice*)
                                        LEOPOLD, PETRICH & SMITH
                                        A Professional Corporation

                                        Slade Metcalf
                                        Rachel Strom
                                        HOGAN LOVELLS US LLP

                                        Attorneys for Defendant
                                        Twentieth Century Fox Film Corporation, Paul
                                        W. S. Anderson and Davis Entertainment, Inc.