USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3-30-2011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -x
                                           :

JAMES MULLER,
                                           :

               Plaintiff,
                                         :        <u>**OPINION**</u>

      - against -
                                         :        08 Civ. 2550 (DC)

TWENTIETH CENTURY FOX FILM
CORPORATION, PAUL W.S. ANDERSON,  :
and DAVIS ENTERTAINMENT, INC.,
                                         :

              Defendants.
                                       :
- - - - - - - - - - - - - - - - - - - -x

**CHIN, Circuit Judge**



        In 2004, defendant Twentieth Century Fox Corporation ("Fox") released the film <u>AVP: Alien vs. Predator</u> (the "Film"). As its title suggested, the Film told the story of a battle between extraterrestrial creatures, the "Aliens" and the "Predators," from Fox's earlier hit movies, <u>Alien</u> and <u>Predator</u> -- with humans caught between.

        Some eight years earlier, plaintiff James Muller had written an original screenplay, <u>The Lost Continent</u> (the "Screenplay"), which told the story of a government-led expedition to the Antarctic to investigate a mysterious structure below the frozen surface, a

secret plan by a group called the "Freemasons" to recover a powerful crystal from the ancient city of Atlantis, and attacks by stone gargoyles come-to-life.

In this case, Muller contends that Fox and defendants Paul W.S. Anderson and Davis Entertainment Company ("DEC"), sued herein as Davis Entertainment, Inc., copied the Screenplay when they wrote and produced the Film.  Muller asserts claims for copyright infringement and breach of implied contract.  Defendants move for summary judgment dismissing the amended complaint.  Muller opposes the motion, and requests additional discovery pursuant to Fed. R. Civ. P. 56(f).

Defendants' motion is granted.  I conclude, on the record before the Court, that no reasonable jury could find that defendants engaged in actual copying or that the Film and the Screenplay are substantially similar within the meaning of the copyright laws.  Indeed, the copyright laws do not protect ideas but only particular expressions of ideas.  Although the Screenplay and the Film are similar in some respects, the similarities relate only to unprotectible ideas, concepts, or abstractions.  Moreover, the two works tell very different stories.  Accordingly, the amended complaint is dismissed, and Muller's Rule 56(f) application is denied.

**BACKGROUND**

**A.    The Facts**

The facts are drawn from the parties' affidavits, depositions, and exhibits, and the Court's summaries of the works

below are based on the Court's review of the Screenplay and the Film.[1]  Any conflicts in the evidence have been resolved in favor of Muller, the party opposing summary judgment.

    1.   **The Screenplay**

       The Screenplay tells the story of the ancient, lost city of Atlantis, which was destroyed by a tidal wave thousands of years ago.  Members of the Freemasons, including the President of the United States, consider themselves the lost city's descendants.  Their goal is to find Atlantis, where they hope to recover a magical crystal that will give them the power to control the world.  The Freemasons' search for Atlantis gains momentum when a government satellite detects a heat signal below Antarctica's surface.  The satellite imagery reveals an underground pyramid surrounded by other structures resembling a city.  The President, who realizes that the satellite has detected Atlantis, sends a team to investigate.  The stated purpose of the expedition is to ensure that the signal's source does not pose a threat to national security.  The actual purpose,

---

      [1]    The Court also reviewed the final screenplay for the Film.  While there are some minor differences between the final screenplay and the Film, none of the differences provides any evidence that defendants copied the Screenplay.  Moreover, it is unnecessary to consider earlier drafts of the screenplay of the Film because I conclude as a matter of law that no substantial similarity exists between the protectable portions of the final versions of the works.  See Walker v. Time Life Films, Inc., 784 F.2d 44, 52 (2d Cir.) (affirming summary judgment over copyright owner's objection that the district court erred in not considering early drafts of a screenplay because "as a matter of law . . . no substantial similarity exist[ed] between the [protectable] portions of the final versions of the works"), cert. denied, 476 U.S. 1159 (1986).

unbeknownst to most members of the expedition team, is to retrieve the crystal for the Freemasons.

The Screenplay begins around 12,500 years ago with an exotic sea vessel creeping up a channel toward a hundred foot high metallic wall.  As the ship approaches, a passageway materializes, allowing the vessel to pass through.  On the other side is a city composed of giant metallic pyramid towers and skyscrapers.

The scene then shifts to the city's inhabitants who are gathering around a large pyramid in the city's center.  They are waiting to hear from their leader, Jahbulon, who arrives at the pyramid shortly thereafter and tells the crowd "a new age is upon us."  Moments later the city is wiped out by a tidal wave.

The Screenplay then switches to the present day, where Dr. Katherine Graham, an archeologist and professor at Princeton University, has just finished an unsuccessful three-year dig in Egypt and is returning to America.  Frustrated by her futile excavation, Dr. Graham is ready to return to a routine semester.

At the same time, a government satellite detects what appears to be a city and a tunnel underneath the Antarctic.  Upon learning of the finding, the President immediately sends two advisors, Bill Mitchell, a Freemason, and Dave Dillon, an agent from the National Security Agency (the "NSA"), on a visit to the Antarctic.  After arriving at the tunnel's entrance, Mitchell and Dillon, whose submarine is too large to pass through, turn around and head back to Washington, D.C.

Back at the nation's capital, Mitchell visits Freemason leader James Volker and relays what he saw.  Both men conclude that the tunnel must lead to Atlantis.  Volker heads to the White House to meet with the President.  The President authorizes a government-led expedition to Antarctica to investigate the satellite's findings, and assures Volker he will be part of the team.

Dillon meets with his NSA supervisor, Thomas McCardle, who assembles the expedition team.  McCardle believes that the mission concerns matters of national security.  Unaware of the President's hidden motives, McCardle assembles a top-notch team.  He sends Dillon to Princeton to recruit Dr. Graham to be the team's research expert.

Although she is hesitant, Dr. Graham realizes that she has no choice.  The next day she goes to NSA headquarters and learns the details of the mission.  She joins McCardle and Dillon to discuss logistics.  In addition to Dr. Graham, the team consists of Volker, five Navy SEALs, Pittman, Conrad, Harper, Motley, and Nugent, and their Captain, Roessler.  Meanwhile, Volker and other members of the Freemasons convene in a dark room at an undisclosed location to discuss the expedition's hidden mission: retrieval of the crystal from Atlantis at all costs.

The expedition team travels to the Antarctic on the USS Chicago, a large submarine, which also contains the Sandshark, a smaller submarine designed to traverse through the tunnel.  Upon arriving at the tunnel entrance, the team boards the Sandshark,

which then maneuvers around the remains of a sunken vessel and other debris lodged inside the channel.  The <u>Sandshark</u> emerges from the tunnel into a calm, giant bay.  In the distance is a mysterious and ancient city.  A large pyramid in the center looms over surrounding skyscrapers.  The top of the pyramid casts a haunting luminescence, the heat source that the satellite detected earlier.

Upon arriving at the city's shoreline, the team disembarks from the <u>Sandshark</u> and heads cautiously toward the pyramid.  They discover statues of gargoyles in a courtyard.  A nearby inscription describes these creatures as the city's guardians.  The team enters a temple in search of more clues about this mysterious city.  Inside are images and inscriptions that Dr. Graham explains are ancient symbols still used by the Freemasons today.  As Dr. Graham writes down her observations, the Navy SEALs leave the temple.  Moments later, they head inside another building.  One is mysteriously killed.

Upon finding the decapitated body, the surviving Navy SEALs immediately exit the building and run back toward the temple.  They pass the courtyard where the gargoyle statues were just moments ago, only to find that the statues have vanished. The SEALs then return to the temple and rejoin the team.

That night, two of the gargoyles reappear inside the temple and attack Nugent and Pitman.  Nugent survives, but Pitman is killed.  Fearing that the gargoyles will come after them next, the remaining team members decide to retreat to the <u>Sandshark</u>.

Upon arriving at the shoreline they find their submarine mysteriously destroyed.  As the team is trying to figure out what happened to the <u>Sandshark</u>, the gargoyles kill Harper and Nugent.

The surviving team members run toward the large pyramid in the center of the city.  Upon entering the pyramid, the team comes across a room filled with thousands of Atlantean bodies all frozen in a cryogenic stasis.  As the team's disbelief subsides, they see a crystal perched in the center of the room.  Volker recognizes the crystal as the one the Freemasons want.  The team's focus then shifts from the crystal to another alluring object in the room -- a large tomb flanked by four golden arches.  Inside is Jahbulon, Atlantis's leader from the Screenplay's opening scene.  When Volker sees the arches he proclaims "City of Golden Gates."  Dr. Graham pulls Dillon aside and voices her skepticism about Volker, telling Dillon that Volker is probably a Freemason who joined the mission to advance his own hidden agenda.

Soon afterwards, Jahbulon reanimates and addresses the team in his native tongue, a language that only Volker understands.  Volker tells Jahbulon about the Freemasons, explaining that after Jahbulon's city was destroyed thousands of years ago, a small group of survivors -- the Freemasons -- compiled the secrets of Atlantis.  For generations these secrets were protected and handed down by the secret society.  Volker then identifies himself as a Freemason.  Simultaneously, Dr. Graham shouts out her independent realization that Volker is a

Freemason.  Moments later, Jahbulon kills Dillon.  In
retaliation, Motley attempts to kill Jahbulon, but Volker smacks
Motley's gun toward the ground.  Motley is then killed by a
gargoyle.  During this fighting, Dr. Graham and Roessler escape
from the pyramid.

Back inside the pyramid, Volker stabs and kills
Jahbulon, and then seizes the crystal.  Volker exits the pyramid
and finds Dr. Graham and Roessler.  The three head to the city's
shore to wait for a rescue submarine to transport them back to
the surface.

As they wait to be rescued, Volker explains that he
killed Jahbulon and took the crystal to prevent the rebirth of
Atlantis.  Were the Atlantean Empire to rise again, Volker warns,
it would enslave the world.  Mitchell arrives in the rescue
submarine.  Volker quickly jumps in as Mitchell produces a gun
and points it at Dr. Graham and Roessler, both of whom are still
on the shore.  Mitchell and Volker then reveal that they are
Freemasons, and their goal during the expedition was to gain
control of the crystal.  They then toss an atomic bomb to
Roessler, speed away into the tunnel, and return safely to the
surface.

Dr. Graham and Roessler, now trapped in Atlantis,
hustle back to the pyramid.  Just before the atomic bomb goes
off, Dr. Graham uses a telepathic power and causes an
interdimensional portal to appear.  She and Roessler run through

- 8 -

the portal and end up in Egypt.  They then fly back to the United States.

Upon their arrival in Washington, Dr. Graham and Roessler track down Volker and Mitchell.  With the NSA's approval, Dr. Graham and Roessler pretend to strike a deal with the Freemasons, allowing Volker to hold on to what he thinks is the crystal, but which is in fact a bomb.  Shortly after, Volker brings the "crystal" to the Freemasons.  The bomb explodes, killing all the society's members other than the President.  In the end, Dr. Graham and Roessler hold on to the real crystal and give a phony replica to the NSA.

Six months later, Dr. Graham, back at Princeton, has just completed a novel about her Antarctica adventure.  She and Roessler are in love, and the crystal is hidden in plain sight -- as an ornament on her desk.

    2.   **The Film**

        a.   **Fox's Alien and Predator Franchises**

<u>Alien</u> (1979), an academy-award winning film starring Sigourney Weaver as "Ripley," had a powerful impact on the science fiction genre.  <u>See</u> Review of <u>Alien</u>, Rotten Tomatoes, http://www.rottentomatoes.com/m/alien (last visited Mar. 28, 2011).  The "Alien" was a terrifying extraterrestrial creature that killed humans traveling in outer space.  <u>See</u> <u>id.</u>  The movie spawned three sequels, two prequels, novels, comic books, and video games.  (<u>See</u> Tim Dirks, Review of <u>Alien</u>, http://www. filmsite.org/alie.html (last visited Mar. 28, 2011); <u>see also</u>

Anderson Decl. ¶ 3; Davis Decl. ¶¶ 5-6).[2]  In fact, the Library of Congress in 2002 added <u>Alien</u> as one of twenty-five "culturally, historically or aesthetically" significant motion pictures to the National Film Registry.  <u>See</u> Library of Congress Information Bulletin: Films Selected for the National Film Registry in 2002 by the Library of Congress (Jan. 2003), http://www.loc.gov/loc/lcib/0301/films2.html.

<u>Predator</u> (1987), starring Arnold Schwarzenegger as Major Alan "Dutch" Schaefer, and its sequel, <u>Predator 2</u> (1990), were also widely popular and led to related novels and comic books.  (<u>See</u> Davis Decl. ¶¶ 4-6; <u>see also</u> Review of <u>Predator</u>, http://m.imdb.com/title/tt0093773 (last visited Mar. 28, 2011)).  The "Predator" was a technologically advanced extraterrestrial creature that hunted humans on Earth.  (<u>See</u> Davis Decl. at ¶ 4).

The respective successes of the Fox-owned <u>Alien</u> and <u>Predator</u> franchises set the foundation for a crossover series, Alien vs. Predator.  (<u>See</u> Anderson Dep. at 64:16-21; Davis Decl. ¶¶ 5-6).  Indeed, in or around 1990, Fox licensed <u>Aliens vs. Predator</u>, a comic book series that presented an epic battle between these two extraterrestrial creatures.  (Tim Dirks, Review of <u>Alien</u>, http://www.filmsite.org/alie.html (last visited Mar. 28, 2011); <u>see also</u> Anderson Decl. ¶ 4; Davis Decl. ¶ 6).

---

[2]     John Davis produced <u>Predator</u> (1987) and <u>Predator 2</u> (1990), and is the President of DEC.  (Davis Decl. ¶ 2).

b.   **The Film**

Fox released the Film for theatrical distribution in the United States in 2004.   (Anderson Decl. ¶ 11).

The Film features a conflict between Aliens and Predators, the two species from the <u>Alien</u> and <u>Predator</u> movies. The plot is as follows: once a century, Predators descend from outer space and travel to an ancient pyramid below Antarctica that is inhabited by Aliens.   Inside the pyramid, the two species engage in a vicious battle.

The Film opens to a dark void and everything is black. Light slowly illuminates what at first look like giant black spider legs.   The image is deliberately reminiscent of the Alien Queen, one of the central characters in the <u>Alien</u> movie series. As the light grows, the audience realizes that the image is a satellite orbiting Earth.   Suddenly, the satellite detects something on Earth and zooms in.   The Film cuts to a receiving station in New Mexico.   There, technicians view the satellite's transmission on a computer, which reveals a heat signal below an island near Antarctica.   The satellite and the receiving station are owned by Weyland Industries and billionaire Charles Weyland. Upon learning about the satellite's signal, Weyland sets about assembling a team to accompany him on an expedition to investigate the finding.

The next scene is set in Nepal where Alexa Woods, the movie's protagonist, is climbing a frozen waterfall.   As she is ascending the wall of ice, she receives a call from Maxwell

Stafford, an employee of Weyland Industries.  Stafford relays a message from Weyland asking Woods to meet him.  When Woods reaches the top of the waterfall she finds Stafford waiting with a helicopter to take her to Weyland.

The setting switches to an excavation site in Mexico where archeologist Sebastian de Rosa is searching for ancient artifacts.  After a particularly unsuccessful day, de Rosa, dejected, retreats to his tent where he finds Stafford waiting.  Stafford recruits de Rosa to join Weyland's expedition.

Shortly after, the members of the expedition convene in a room on a large ship in the middle of the Atlantic Ocean.  The team consists of scientists, including de Rosa, as well as Stafford, Weyland, and a group of soldiers.  Woods, who still has not officially signed on to the mission, is slated to be the team's guide because of her reputation as a seasoned explorer of Antarctica and other dangerous environments.  Weyland then enters and reports that his satellite has detected a pyramid 2,000 feet below Bouvetoya, an island near Antarctica.  He is unsure, however, of the origin of the pyramid.  As members of the team speculate about its origin, Woods tells Weyland that she will need three weeks to train the team.  She stresses the dangers of a trip to Bouvetoya, one of the world's most isolated places.  Weyland responds that they do not have that kind of time because others will soon detect the pyramid.  Woods tells Weyland to find another guide.

Meanwhile, in outer space, a Predator spaceship heads toward Earth. The spaceship shoots a searing hot beam at Antarctica, which burns a tunnel from the frozen surface to the underground pyramid. The Film then cuts back to Weyland's ship where the team is preparing to embark on the expedition. Woods, without explicitly acknowledging her decision to stay on as its guide, rounds the team up and gives it basic safety rules.

Upon arriving on Bouvetoya, the team proceeds to an abandoned whaling station on the surface directly above the underground pyramid. The station, Woods explains, has been abandoned since 1904 when everyone who worked there mysteriously disappeared. The team fans out to ensure that the site is secure. As it does so, the team comes upon the Predators' laser-made tunnel, and is bewildered because the satellite imagery from twenty-four hours earlier did not reveal its existence. The team realizes that the only way to learn who or what made the tunnel is to go down to the pyramid and find out. The team then descends into the tunnel, using ropes to scale down its ice walls.

Suddenly, Weyland's rope snaps and he begins to hurl down the tunnel. Stafford and de Rosa desperately try to grab Weyland, but they both miss. Fortunately, Woods catches Weyland's jacket with her ice pick, and saves his life by pinning him against the tunnel wall. As this is happening, the Predator spaceship secretly lands near the whaling station.

Upon emerging from the tunnel, the team finds itself in an ice grotto with a colossal pyramid directly ahead.  The team proceeds to climb the hundreds of stone steps that lead to the entrance of the pyramid.  At the same time, the Predators, using a computer on their spaceship, track the team's every move.

Shifting back to the pyramid, the next scene shows a large pool of freezing vapor located in one of the pyramid's chambers.  Moments later, the Alien Queen, who is chained to a torture machine, rises out of the mist.  She is left suspended in mid-air, and then, abruptly, emerges from her frozen state. After unsuccessfully struggling to break free from the chains, the Queen begins to lay her eggs.  Meanwhile, on the surface, the Predators attack and kill the team members guarding the whaling station and the tunnel's entrance.  The Predators make their way down the tunnel and into the pyramid.

Back inside the pyramid, the team discovers a sacrificial chamber filled with human skeletons with ruptured rib cages.  Two team members are instructed to stand guard.  The rest of the team continues into an adjacent chamber where one member, attempting to remove a weapon lodged in an open tomb, inadvertently hits a hidden switch.  As a result, the pyramid's walls suddenly begin to move, sealing up old entrances and revealing new passageways.  The scene then cuts back to the sacrificial chamber where the two guards are now trapped. Moments later, the two guards are attacked by "facehuggers," which first appeared in the original <u>Alien</u> (1979) film.  The

facehuggers wrap around their human hosts' faces, implant Alien embryos, and then detach.  The embryos quickly grow into adult Aliens and subsequently burst out of the humans' chests, killing their hosts.

Meanwhile, the team members in the second chamber plan to head back to the whaling station for the night.  The plan goes awry as the team is caught inside the pyramid and in the middle of an ensuing battle between the Aliens and the Predators. Through the translation of hieroglyphics, the team's surviving members eventually learn why the Predators are here attacking the Aliens.  According to the hieroglyphics, every one hundred years Predators visit Antarctica to hunt Aliens.  During these hunts, humans unwillingly serve as hosts for newly born Aliens via the facehuggers.  These new Aliens are the Predators' prey.  If overpowered, the Predators can, however, activate self-destruct weapons to kill both the Aliens and themselves.  The team realizes that the heat bloom was meant to draw them to the pyramid to be incubators for new Aliens.

In the ongoing battle, which is the focus of the second half of the Film, Woods is the only team member to survive.  The Aliens also kill all but one of the Predators.  In a desperate attempt for survival, Woods forms a strategic alliance with the sole remaining Predator, Scar.  Together, Woods and Scar manage to escape the pyramid.  Upon arriving on the island's surface, Woods and Scar use the Predator's self-destruct device to destroy the pyramid and its remaining Alien inhabitants.  The battle,

however, rages on at the whaling station as Woods and Scar fight
the Alien Queen, who also escaped from the pyramid.  Ultimately,
the Queen is killed when she falls over a cliff into freezing
water.  Shortly after, Scar dies from his battle wounds.

In the final scene, more Predators descend from outer
space to collect Scar, their fallen comrade.  They reward Woods
with one of their weapons in recognition of her courage and
skill, and then take off in their spaceship.  As the Predators
travel back into space, the audience learns that Scar has been
impregnated with a hybrid Alien-Predator spawn.

## B.    Prior Proceedings

This case was commenced by the filing of a summons and
complaint on March 14, 2008.  An amended complaint was filed on
January 20, 2009.  It asserts two causes of action: copyright
infringement pursuant to the Copyright Act, 17 U.S.C. § 101 et
seq., and breach of implied contract under the common law.  (Am.
Compl. ¶¶ 8, 38-47, 48-54).

The parties engaged in extensive and contentious
discovery.  This motion followed.  In opposing the motion, Muller
asserted that he needed additional discovery.

### DISCUSSION

## A.    Copyright Infringement

### 1.    Applicable Law

To prevail on a claim of copyright infringement, a
plaintiff must prove two elements: "(1) ownership of a valid
copyright, and (2) copying of constituent elements of the work

- 16 -

that are original."  <u>Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.</u>,
499 U.S. 340, 361 (1991); <u>accord</u> <u>Rogers v. Koons</u>, 960 F.2d 301,
306 (2d Cir. 1992).  Muller provided the Court with a copy of the
certificate of copyright registration for the Screenplay, and
defendants do not, for purposes of this motion, contest the
validity of the copyright.  Hence, I assume Muller owns a valid
copyright in the Screenplay.  (<u>See</u> Compl. Ex. 2; Def. Mem. Supp.
Summ. J. 16).  The second element, copying, is comprised of two
requirements: actual copying and improper appropriation.
<u>Laureyssens v. Idea Group, Inc.</u>, 964 F.2d 131, 139-40 (2d Cir.
1992).

> **a.   Actual Copying**

        Actual copying may be established by direct or
circumstantial evidence.  The latter includes proof, for example,
that (1) the alleged infringer had access to the protected work
and (2) the two works share similarities "probative of copying."
<u>Jorgensen</u>, 351 F.3d at 51.  Access may be "inferred from the fact
that a work was widely disseminated or that a party had a
reasonable possibility of viewing the prior work."  <u>Boisson v.
Banian, Ltd.</u>, 273 F.3d 262, 270 (2d Cir. 2001).  "A reasonable
possibility" is not simply a "bare possibility"; "access cannot
be based on mere speculation or conjecture."  <u>Jorgensen</u>, 351 F.3d
at 51 (internal quotations omitted).  The copyright owner must
instead present "significant, affirmative and probative evidence"
to support a claim of access.  <u>Id.</u> (internal quotations omitted).

If the copyright owner fails to produce evidence of both access and probative similarity, he may defeat a motion for summary judgment by showing that the works in question are "strikingly similar." Repp & K&R Music, Inc. v. Webber, 132 F.3d 882, 889 (2d Cir. 1997) ("We have held that where there are striking similarities probative of copying, proof of access may be inferred."), cert. denied, 525 U.S. 815 (1998). Two works are considered to be "strikingly similar" if creation of one is so dependent on the other "as to preclude the possibility of independent creation." Id. (internal quotations omitted). Striking similarity can be shown through expert testimony. See Gaste v. Kaiserman, 863 F.2d 1061, 1068 (2d Cir. 1988). A defendant may rebut a prima facie case of infringement by introducing evidence of independent creation. Repp & K&R Music, Inc., 132 F.3d at 889.

### b. **Improper Appropriation**

Once actual copying has been established, the copyright owner must then satisfy the "'improper appropriation' requirement by demonstrating that 'substantial similarities' as to the protected elements of the work would cause an average lay observer to 'recognize the alleged copy as having been appropriated from the copyrighted work.'" Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp. 2d 382, 389 (S.D.N.Y. 2005) (quoting Durham Indus., Inc. v. Tomy Corp., 630

F.2d 905, 911-12 (2d Cir. 1980)).[3]  "For [this] prong it is essential that the similarity relate to copyrightable material." Id. at 389-90 (internal quotations omitted).   "When similar works resemble each other only in unprotected aspects -- for example, when similarities inhere in ideas, which are by definition unprotected, or in expression that is not proprietary to plaintiff -- defendant prevails."  Id. at 390 (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[B][2] (2005)).

Critical to the issue of improper appropriation is that the copied elements of the work are original and non-trivial. Id.; see Feist Publ'ns, 499 U.S. at 345 ("The sine qua non of copyright is originality.").  As used in copyright law, "original" means that "the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."  Feist Publ'ns, 499 U.S. at 345.

_____

[3]     An analysis of similarity under the improper appropriation prong of a copyright infringement claim is distinct from the actual copying element.  "The similarities [under the first prong] of the test need only 'raise a question of actual copying'; they need not be 'substantial.'"  Kerr v. New Yorker Magazine, Inc., 63 F. Supp. 2d 320, 325 (S.D.N.Y. 1999) (quoting Laureyssens, 964 F.2d at 140).  Under the second prong, a court considers whether "the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred."  Ringgold v. Black Entm't Television, Inc., 126 F.3d 70, 75 (2d Cir. 1997). Such a comparison "must be made on a case-by-case basis, as there are no bright-line rules for what constitutes substantial similarity."  Sandoval v. New Line Cinema Corp., 147 F.3d 215, 217 (2d Cir. 1998) (citing Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994)).

A central tenet of copyright law is that only a copyright owner's particular expression of his or her idea is protected, not the idea itself.  17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea . . . [or] concept . . . regardless of the form in which it was described, explained, illustrated, or embodied in such a work."); see also Rogers, 960 F.2d at 308 ("What is protected is the original or unique way that an author expresses . . . ideas, concepts, principles, or processes [that are found in the common domain].").  Thus, upon examining the works, courts must determine "'whether the similarities shared by the works are something more than mere generalized idea[s] or themes.'"  Walker, 784 F.2d at 48-49 (quoting Warner Bros. v. American Broad. Co., 654 F.2d 204, 208 (2d Cir. 1981)).

In addition, "certain literary or cinematographic elements are not protected even if they take the form of concrete expression, such as 'stock' themes or 'scènes à faire.'"  Arden v. Columbia Pictures Indus., 908 F. Supp. 1248, 1259 (S.D.N.Y. 1995) (quoting Walker, 784 F.2d at 50).  Stock themes, or themes that are "commonly linked to a particular genre," are only protected under the copyright law "to the extent they are given unique . . . expression in an original creation." Walker, 784 F.2d at 50.  For example, "the familiar figure of the Irish cop" is a stock theme "of police fiction."  Id.

"Scènes à faire" are those elements of a work that "necessarily result from the choice of a setting or situation."

Id.; see Hoehling v. Universal City Studios, Inc., 618 F.2d 972,
979 (2d Cir.) (explaining that "scènes à faire" are those
"incidents, characters or settings which are as a practical
matter indispensable, or at least standard, in the treatment of a
given topic") (internal quotations omitted), cert. denied, 449
U.S. 841 (1980).  In Walker, which dealt with a novel and a film
that both portrayed the 41st Precinct in the South Bronx, the
Second Circuit found that depictions of drunks, prostitutes,
rodents, and abandoned cars were unprotectible "scènes à faire."
784 F.2d at 50.

### c.  Summary Judgment Standard

The standards governing motions for summary judgment
are well-settled.  A court may grant summary judgment only where
there is no genuine issue of material fact and the moving party
is therefore entitled to judgment as a matter of law.  See Fed.
R. Civ. P. 56(c); accord Matsushita Elec. Indus. Co. v. Zenith
Radio Corp., 475 U.S. 574 (1986).  Summary judgment should be
denied "if the evidence is such that a reasonable jury could
return a verdict" in favor of the non-moving party.  See NetJets
Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 178-79 (2d
Cir. 2008).  In deciding a motion for summary judgment, the court
must construe the evidence in the light most favorable to the
non-moving party and draw all reasonable inferences in the that
party's favor.  In re "Agent Orange" Prod. Liab. Litig., 517 F.3d
76, 87 (2d Cir. 2008).  The non-moving party cannot, however,
"escape summary judgment merely by vaguely asserting the

existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal citations and quotations omitted).

In deciding a motion for summary judgment, the role of the court is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Because the court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence. See Jeffreys v. City of N.Y., 426 F.3d 549, 554 (2d Cir. 2005); Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).

In the context of a copyright infringement claim, summary judgment may be granted when any similarities between the works relate only to non-copyrightable elements or when no reasonable jury could find the two works substantially similar. Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1072 (2d Cir. 1992). Determining whether there is substantial similarity between a written work and an allegedly infringing motion picture is assessed through a "detailed viewing or reading of the works themselves," Walker, 784 F.2d at 52; and summary judgment is frequently granted in this context. See, e.g., Williams v. Crichton, 84 F.3d 581, 588-91 (2d Cir. 1996) (affirming summary judgment in favor of defendants on claim alleging that motion picture Jurassic Park infringed upon copyright held in series of

children's books); <u>Walker</u>, 784 F.2d at 48-52 (affirming summary judgment in favor of defendants on claim that film <u>Fort Apache: The Bronx</u> infringed upon copyright in book <u>Fort Apache</u>).

  2.   **Application**

I consider in turn the two aspects of the element of copying: actual copying and improper appropriation.

    a.   **Actual Copying**

Muller does not offer any direct evidence of copying by defendants.  Rather, he seeks to prove actual copying circumstantially by showing that (i) defendants had access to the Screenplay and (ii) the two works are "probatively similar."

      i.   **Access**

As for access, Muller offers the following theories. He contends that a copy of the Screenplay was sent to third parties Warner Brothers and Morgan Creek in 1997, when Anderson was allegedly writing and directing another film for them.  (Am. Compl. ¶¶ 19, 20 & nn.2-3, 21, 26; Pl. Mem. Opp. Summ. J. ("Pl. Opp.") 14-15).  He claims also that a division of Fox, Fox 2000, received the screenplay in 1998.  (Am. Compl. ¶¶ 23, 26; Pl. Opp. 20-21).  Finally, he relies on alleged submissions of the Screenplay in 1998 to Corey Witte and Todd Hoffman (Pl. Opp. 16-20), two independent producers who were renting space from DEC at the time (<u>see</u> Davis Dep. at 17:8-21:11; Davis Decl. ¶ 11).  These assertions fail, however, to raise a genuine issue for trial, for they are based on speculation and conjecture rather than concrete evidence.

- 23 -

First, Muller has presented no evidence to show that Anderson received or read the Screenplay.  Indeed, Muller testified that he does not have any information to suggest that Anderson ever received a copy of the Screenplay prior to this lawsuit.  (Muller Dep. at 253:23-254:24).

Second, Anderson testified that he neither read nor heard of the Screenplay prior to the lawsuit.  (Anderson Dep. at 9:3-5).  Alex Young, vice president of production for Fox when the Film was developed, has stated that he never met, spoke to, or heard of Muller, or read any of Muller's works prior to the lawsuit.  (Young Decl. ¶ 9).

Third, although defendants acknowledge that Fox 2000 received a copy of the Screenplay in 1998, Fox 2000 had no role in any aspect of the Alien or Predator franchises, including the Film.  (Moldovan Decl. ¶ 2; see also Young Decl. ¶ 8).[4]  Rather, when the Film was developed, Fox 2000 had a different president and separate creative staff and budget than Fox.  (Young Decl. ¶ 8).  In addition, Fox 2000 was primarily responsible for low-budget films while Fox was responsible for the acquisition and production of high-budget projects, like Alien, Predator, and the Film (Moldovan Decl. ¶¶ 2, 6).  The lack of any relationship between Fox 2000 and those in control of creating the Film

---

[4]      Suzie Moldovan is a former employee of Fox 2000 who was the apparent recipient of the Screenplay in 1998.  (Moldovan Decl. ¶ 3).  She does not remember receiving the Screenplay, she does not recognize Muller's name, and to the best of her recollection she has never read anything written by Muller.  (Id. ¶ 4).  Moreover, she did not have any creative input in the Film. (Id. ¶¶ 2, 6).

demonstrates the absence of any issue of material fact as to whether defendants had access to the Screenplay.  See Jorgensen, 351 F.3d at 52.

Finally, there is no evidence that independent producers Hoffman or Witte were involved in any aspect of the Film.  (See Davis Decl. ¶ 11).  There is no evidence that Witte ever received a copy of the Screenplay.  (See Witte Decl. ¶ 6). Likewise, Hoffman does not recall ever reading the Screenplay. (Hoffman Decl. ¶ 8).  Even assuming Hoffman received a copy of the Screenplay, he stated that he never provided it to anyone at DEC or Fox.  (Id. ¶¶ 4, 8).  Muller has offered no evidence to contradict these sworn statements.

Hence, at best Muller alleges only "bare corporate receipt" of the Screenplay by Warner Brothers, Morgan Creek, and Fox 2000.  "[W]ithout any allegation of a nexus between the recipients and the alleged infringers," Muller's conclusory and conjectural assertions are "insufficient to raise a triable issue of access."  Jorgensen, 351 F.3d at 51.

### ii.  Probative Similarity

As to "probative similarity," Muller contends that the Screenplay and the Film share a "striking similarity."  As a comparison of the Screenplay and the Film make clear, this is simply not so.  No reasonable jury could find that the two works were strikingly similar.  To the contrary, as discussed more fully below, they are very different works.

Muller relies heavily on his expert's original and supplemental reports (Am. Compl. ¶¶ 28-382; Pl. Opp. 22-25), which include a list of several hundred alleged similarities between the two works with respect to theme, plot, setting, sequence of events, characters, and dialogue (Am. Compl., Ex. E-F).  Muller's expert, however, merely "'emphasizes random similarities scattered through the works,'" rendering his conclusions "'inherently subjective and unreliable.'"  Williams, 84 F.3d at 590 (quoting Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984), cert. denied, 470 U.S. 1050 (1985)).  Moreover, many of the pairings are not actually similar.[5]  Many of the similarities are common or stock themes that appear often in these types of works.  See Sherman v. Jones, 457 F. Supp. 2d 793, 800-01 (E.D. Mich. 2006) (finding no striking similarity because any similarities, including the common use of over 100 words, flowed naturally from common themes, not from plaintiff's creativity).  In addition, "[t]he mere existence of multiple similarities is insufficient to meet the test [for striking similarity]."  Gal v. Viacom Int'l, Inc., 518 F. Supp. 2d 526, 543 (S.D.N.Y. 2007).  The expert misses the forest for the trees,

---

[5]    Muller contends, for example, that the following two phrases are substantially similar: "We don't have that kind of time.  I'm not the only one with a satellite over Antarctica.  Others will be here soon" and "The mission will be to evaluate what you find and decide if it's any threat to the security of the United States."  (Am. Compl. ¶ 30).  Even an extremely strained reading of the two fails to reveal an underlying similarity, let alone substantial similarity.

as he ignores the inescapable fact that the two works tell two very different stories.

In sum, no material issues of fact exist as to actual copying, for no reasonable jury could find access or probative or striking similarity.

### iii.  **Independent Creation**

In contrast to Muller's virtually non-existent evidence of copying, defendants submitted indisputable evidence of their independent creation of the Film.  The Film sought to capitalize on Fox's highly successful <u>Alien</u> and <u>Predator</u> franchises.  (<u>See</u> Davis Dep. at 41:2-42:6; Anderson Dep. at 40: 5-23, 64:14-68:4; Anderson Decl. ¶¶ 11, 13; Young Decl. ¶ 3; Davis Decl. ¶ 6). Indeed, the writers of the earlier <u>Alien</u> and <u>Predator</u> movies are listed in the Film's writing credits.  (<u>See</u> Anderson Decl. ¶ 11; Review of <u>AVP: Alien vs. Predator</u> (2004), http://www.imdb.com/ title/tt0370263 (last visited Mar. 28, 2011)).  Signature characters from the prior <u>Alien</u> and <u>Predator</u> works, including the Alien Queen, the Predators, and the facehuggers, appear in the Film.  Moreover, Anderson stated that the Film was partly inspired by the Fox-owned 1990 comic book, <u>Aliens vs. Predator</u>. (Anderson Decl. ¶ 20).  Anderson explained that specific elements in the Film were derived from the comic book, including the concept of a group of humans caught in the crossfire between battling Aliens and Predators.  (<u>Id.</u> ¶ 21).

Muller does not challenge defendants' claim that the <u>Alien</u> and <u>Predator</u> franchises served as independent sources for

the Film.[6]  Where, as here, defendants' own prior works contain
the same elements, they have "no reason, beyond the illicit
thrill of copyright infringement, to copy wrongfully from another
what [they] could legally copy from [themselves]." Murray Hill
Publ'ns, Inc. v. Twentieth Century Fox Film Corp., 361 F.3d 312,
326 (6th Cir. 2004).  Indeed, "where an element occurs both in
the defendant's prior work and the plaintiff's prior work, no
inference of copying can be drawn." Id.; see Sheldon v. Metro-
Goldwyn Pictures Corp., 81 F.2d 49, 54 (2d Cir. 1936) ("If the
defendant has had access to other material which would have
served him as well, his disclaimer [of copying] becomes more
plausible.").  Here, there was no reason for defendants to copy
the Screenplay, as they needed simply to draw on their own prior
materials.

---

[6]     Muller argues instead that Anderson waived his right to
rely on these prior works because of a 2004 statement he made to
the Writers Guild of America ("WGA").  (Pl. Opp. 5, 26).  This
argument is unavailing.  Even assuming some binding effect,
Muller takes Anderson's WGA statement out of context, making it
appear as though Anderson disclaimed any reliance on "the earlier
scripts," i.e., the prior Alien and Predator works.  When read in
its entirety, however, Anderson's statement was that his script
brought a completely new and original take on the story as
compared to two unpublished screenplays by two other potential
candidates for Anderson's position, neither of whom had
previously contributed to the Alien franchise.  (Anderson
Supplemental ("Supp.") Decl. ¶¶ 2-13; Anderson Supp. Decl., Ex.
G).  Tellingly, Muller does not recite the end of Anderson's
statement in which he explains that any similarities between the
three competing scripts was due to the 'common piece source
material,' namely, the 1990 Aliens vs. Predator comic book
series, and the original Alien and Predator movies.  (Anderson
Supp. Decl., Ex. G).

### b.   **Improper Appropriation**

Even assuming that the Film actually copied the Screenplay, summary judgment is still appropriate because no reasonable jury could find that the works are substantially similar in their protectable elements.  I now turn to the elements Muller asserts are copied from his Screenplay, namely, the "overall concept and feel," theme, plot, characters, setting, pace, sequence of events, and dialogue.

### a.  **Overall Concept and Feel**

Originality may be determined by the "total concept and feel" of the works.  <u>Bill Diodato</u>, 388 F. Supp. 2d at 393.  Here, the overall concept and feel of the Film is very different from the overall concept and feel of the Screenplay.  The heart of the Film is the conflict between Aliens and Predators, with the humans caught between; clearly, Fox was seeking to capitalize on its franchise characters from its earlier movies.  At best, the Screenplay fell within the same adventure and action genre, but it is a story about the lost city of Atlantis and humans struggling with each other.  Instead of extraterrestrial creatures from space, it features Jahbulon, Atlantis's leader from thousands of years ago, who emerges from a tomb, and gargoyle statues that come to life.

The Screenplay is ultimately one of many action-adventure works in which humans, either out of curiosity or greed, set out in search of a long lost civilization or a

mysterious power.[7]  The "overall concept and feel" of discovering Atlantis and its attendant mysteries is one that has appeared often in popular culture.  Accordingly, Muller's concept, and elements that naturally flow from it, cannot be protected.

The elements that are arguably unique to Muller's expression of the idea in fact distinguish the Screenplay from the allegedly infringing Film.  For example, in the Screenplay, the threats and dangers are from evil humans, the Freemasons and their Atlantean ancestors.  In the Film, the threats and dangers are presented by the Aliens and Predators.  In addition, the Screenplay centers around power-hungry humans who, until the end of the Screenplay, remain in control.  By contrast, the concept and feel of the Film is a world where humans, short of forming a strategic alliance with another species, lack any control.

### b.  Theme

Muller asserts that the two works are substantially similar with respect to theme without distinguishing between their protectable and unprotectible elements.  In fact, however, there is no actionable similarity between the works' themes.  The Screenplay involves the Freemason's quest for power and the consequences of man's hubris in believing that he can control the world.  The Film is about an epic battle between Predators and

---

[7]     The Screenplay is hardly original.  A science-fiction film by the same name -- The Lost Continent -- was released in 1968, many years prior to Muller's writing of the Screenplay.  It also began with a ship moving through the mist, and the crew and passengers finding themselves in a mysterious land.  See http://en.m.wikipedia.org/wiki/The_Lost_Continent_(1968_film) (last visited Mar. 26, 2011).

Aliens.  Any thematic similarities are incidental to the idea of an expedition to a dangerous and remote location, or the stock theme of action-adventure meets science-fiction, and accordingly are unprotected.  <u>See, e.g.</u>, <u>Williams</u>, 84 F.3d at 589 (finding no substantial similarity where theme of competing works "relate[d] to the unprotectible idea of a dinosaur zoo").

### c.  <u>Plot</u>

Muller argues that the Film's plot is substantially similar to the plot in his Screenplay.  Not so.  While both works tell the story of an expedition team that travels to Antarctica where they discover an underground ancient pyramid or city, and subsequently encounter hostile forces, "'in moving to the next level of specificity, differences in plot and structure far outweigh this general likeness.'"  <u>Arden</u>, 908 F. Supp. at 1260 (quoting <u>Walker</u>, 784 F.2d at 49).  For instance, the Screenplay encompasses Muller's spin on the well-known Atlantis legend, involves a romance between Dr. Graham and Roessler, and has a definitive ending, with the "good guys" triumphing.  In contrast, the Film has only one story-line: Aliens battling Predators, with the humans caught between.  The Film is devoid of romance, and ends in a cliffhanger -- an apparent inter-species breeding between Aliens and Predators.

Any similarities in plot and structure stem directly from the stock theme of an action-adventure staged in an ancient underground pyramid or city, and thus are unprotectible.  For example, that a team might get trapped underground is an

- 31 -

incidental element to the treatment of an expedition to a
mysterious and ancient location.  Such an occurrence is too
general to be protectable.  See, e.g., Zambito v. Paramount
Pictures Corp., 613 F. Supp. 1107, 1112 (E.D.N.Y. 1985) ("That
treasure might be hidden in a cave inhabited by snakes, that fire
might be used to repel the snakes, that birds might frighten an
intruder in the jungle . . . all are indispensable elements to
the treatment of 'Raiders [of the Lost Ark's]' theme, and are, as
a matter of law, simply too general to be protectable.").[8]

### d.   **Characters and Character Development**

Muller contends that the characters featured in the
Film are substantially similar to those in the Screenplay.
Although Dr. Graham and Woods bear superficial similarities, such
as the fact that both serve as the team expert, escape an
underground pyramid, and survive an expedition to the Antarctic,
these similarities are concepts or ideas that do not reach the
level of protectable expression.  See Allen v. Scholastic, Inc.,
739 F. Supp. 2d 642, 660 (S.D.N.Y. 2011); see, e.g., Arden, 908
F. Supp. at 1261 (finding no substantial similarity between two
thirty-something, self-centered bachelors who both become trapped
in a repeating day).

---

[8]     For example, the Walt Disney movie National Treasure,
released in 2004 and starring Nicholas Cage, also involved a
historian as the protagonist, a ship in the Arctic, a group
called the "Freemasons," references to a pyramid, scenes
underground, and a romantic ending.  See http://en.wikipedia.
org/wiki/National_Treasure_(film) (last visited Mar. 28, 2011).

Despite these shared general traits, Dr. Graham and Woods are also very different characters.  Dr. Graham is a professor at Princeton University who is recruited as a research guide for the Antarctica expedition.  She is an asset to the team because of her extensive knowledge of ancient civilizations and her ability to interpret hieroglyphics.  Woods, in contrast, is a seasoned explorer of the Antarctic and other dangerous environments whose courage and physical strength are showcased in the Film.  In addition, Dr. Graham has a love interest, while Woods, somewhat of a loner, does not have any romantic relationship.  While both are women, Dr. Graham is a Princeton professor, while Woods is an action hero in the mode of Sigourney Weaver's "Ripley."  Examining each protagonist as a whole, no reasonable juror could conclude that Dr. Graham and Woods are substantially similar.

Likewise, although Volker and de Rosa are both able to translate hieroglyphics, and McCardle and Weyland are both in charge of assembling an expedition team, these aspects necessarily result from a setting of an ancient pyramid in a remote area.  These similarities, therefore, are unprotectible as "scènes à faire."  See Walker, 784 F.2d at 50 (explaining that "[e]lements such as drunks, prostitutes, . . . and derelict cars" are unprotectible as "scènes à faire" because they necessarily result from the choice of a setting or situation).

Muller also asserts that Jahbulon is substantially similar to the Alien Queen because both are initially frozen in

ice but then reanimate, are leaders, and are eventually slain. These similarities, however, "exist[] only at a level of abstractions too basic to permit any inference that defendant[s] wrongfully appropriated any expression of plaintiff's ideas." Arden, 908 F. Supp. at 1261 (internal citation omitted).  The same can be said of Muller's remaining alleged character similarities, including any similarities between the gargoyles and Aliens.

In addition, Muller points to the use of similar plot devices such as the initial reluctance of both Dr. Graham and Woods to participate in the expeditions.  Such literary devices, however, cannot be copyrighted.  See Denker v. Uhry, 820 F. Supp. 722, 732 (S.D.N.Y. 1992) ("Generalized plot devices . . . are not entitled to copyright protection.").  Thus, any similarity with respect to this element cannot be the basis of a copyright infringement action.

### e.  **Setting**

The settings of the two works also do not give rise to a finding of substantial similarity.  Although both works are primarily set in or near Antarctica, and both use an underground pyramid and archeological excavation settings, these are not forms of expression that can be copyrighted.  This is because any similarity based on the shared use of these common situations is far too general to be the basis of a copyright infringement action.

Furthermore, the settings of the works are also markedly different.  The underground setting in the Screenplay is depicted by a sprawling, futuristic city marked by skyscrapers, courtyards, and a pyramid.  The city is surrounded by a giant bay and is thus set off from the tunnel leading to the surface.  Also, important parts of the Screenplay are set in Washington and Princeton.  In contrast, the Film's underground setting is simply a pyramid adjacent to the opening of the tunnel.  The Film's settings also include scenes in outer space, a receiving station in New Mexico, and a frozen waterfall in Nepal.

### f.  Pace

While both the Screenplay and the Film are relatively fast-paced, this likeness cannot, of course, render the works substantially similar.  See Williams, 84 F.3d at 590 (noting that similarity in pace "without more, does not create an issue of overall substantial similarity between the works").

### g.  Sequence of Events

Upon reviewing the Screenplay and Film, it is clear that there is no actionable similarity between the sequence of events depicted in the works.  Any such similarities are incidental to the expression of a dangerous expedition or the theme of science-fiction meets action-adventure, and thus are unprotected.[9]

---

[9]   For example, the sequence of encountering challenges in traversing a tunnel, while not absolutely essential to the concept of a dangerous expedition, is certainly incidental and commonly linked to such an idea.  Likewise, the sequence of the Alien Queen/Atlantean King emerging from a frozen cryogenic

### h.  <u>Dialogue</u>

Muller asserts that similar text in the two works constitutes substantial similarity.  I disagree.  Although Muller points to a number of allegedly overlapping words and phrases, as explained above, such lists are "inherently subjective and unreliable," particularly where "the list emphasizes random similarities scattered throughout the works."  <u>Williams</u>, 84 F.3d at 590 (quoting <u>Litchfield</u>, 736 F.2d at 1356).  Such a scattershot approach "cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another."  <u>Id.</u>

In addition, although both works use the term "heat bloom" to refer to a heat signal, the share used of this short phrase cannot serve as the basis of a copyright infringement action.  This is because the phrase itself is not the offspring of Muller's Screenplay and Muller has not embellished the term in any way or otherwise infused it with a "creative spark," <u>see</u> <u>Acuff-Rose Music, Inc. v. Jostens, Inc.</u>, 988 F. Supp. 289, 294 (S.D.N.Y. 1997) (finding no infringement of lyrics in part because the lyrics did not originate with song's creators).  (<u>See</u> Anderson Dep. at 68:9-69:17; Def. Mem. Supp. Summ J. 23 n.12 (noting that the term "heat bloom" was used prior to the creation

---

stasis, while not absolutely essential to the theme of a science-fiction meets action-adventure work "in the vein" of <u>Alien</u>, is certainly incidental to such a premise.

of either the Screenplay or the Film, as for example, in the 1990 movie Hunt For Red October to refer to the heat generated by a secret submarine detected by a satellite)).

In conclusion, summary judgment is appropriate because the only similarities between the Screenplay and the Film are insubstantial, and pertain to non-copyrightable ideas, unprotected stock themes, or "scènes à faire," and not to protected expression.  See Arden, 908 F. Supp. 2d at 1263 (noting that some similarities exist, but at a level of expression too general or insignificant to be protectible); Smith v. Weinstein, 578 F. Supp. 1297, 1302 (S.D.N.Y.) (same), aff'd, 738 F.2d 419 (2d Cir. 1984).  Accordingly, defendants' motion for summary judgment is granted as to Muller's copyright infringement claim.

## B.   **Breach of Implied Contract**

Muller's claim for breach of implied contract is based on the same allegations underlying his copyright claim: defendants' purported failure to compensate and credit him for the alleged unauthorized use of his Screenplay.

### 1.   **Applicable Law**

The Copyright Act provides:

All legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in Section 106 in works of authorship that are fixed in tangible form of expression and come within the subject matter of copyright . . . are governed exclusively by this title.  No person is entitled to any such right or equivalent right in any such work under the common law or statutes of any state.

17 U.S.C. § 301.  Claims brought pursuant to state law are
preempted by the Copyright Act where "(1) the subject matter of
the state-law right falls within the subject matter of the
copyright laws; and (2) the state-law right asserted is
equivalent to the exclusive rights protected by federal copyright
law."  Kregos v. Associated Press, 3 F.3d 656, 666 (2d Cir.
1993).

   2.   **Application**

        The subject matter of Muller's state law breach of
contract claim falls squarely within the subject matter of the
copyright laws.  See Boyle v. Stephens, Inc., No. 97 Civ. 1351,
1998 WL 690816 (S.D.N.Y. Sept. 29, 1998) (applying a "broad view"
of scope of subject matter of copyright laws).  Additionally,
Muller's state law right to receive credit and compensation for
the alleged unauthorized use of his Screenplay is equivalent to
the exclusive rights protected by federal copyright law.  See
Smith v. New Line Cinema, No. 03 Civ. 5274 (DC), 2004 WL 2049232,
at *5 (S.D.N.Y. Sept. 13, 2004); Panizza v. Mattel, Inc., No. 02
Civ. 7722, 2003 WL 22251317, at *2 (S.D.N.Y. Sept. 30, 2003)
(holding that implied state-law contract claim based on producer
of television show's failure to compensate plaintiff for creative
ideas was preempted by Copyright Act).  Accordingly, Muller's
breach of implied contract claim is preempted by the Copyright
Act and is therefore dismissed.

C.    **Rule 56(f) Request**

    1.    **Applicable Law**

        In opposing a summary judgment motion, a party may demonstrate, pursuant to Rule 56(f), that it is entitled to additional discovery by submitting an affidavit showing "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999) (internal quotations and citation omitted).  Relief under Rule 56(f) will be denied if the discovery appears irrelevant to the issues to be adjudicated. See Contemporary Mission, Inc. v. N.Y. Times Co., 842 F.3d 612, 622 (2d Cir. 1988).  Additionally, "[e]ven where a Rule 56(f) motion is properly supported, a district court may refuse to allow additional discover if it deems the request to be based on speculation as to what potentially could be discovered." Nat'l Union Fire Ins. Co. v. Stroh Co., 265 F.3d 97, 117 (2d Cir. 2001).

    2.    **Application**

        Muller's request for additional discovery pursuant to Rule 56(f) is denied.  The documents requested by Muller would not create a material issue of fact as to the substantial similarity between the works, and thus would not alter the disposition of this case.  Muller requests (1) the production of Anderson's computer materials for examination by a Court

- 39 -

appointed independent expert, and (2) the opportunity to depose
each of the defendants for a second time in light of defendants'
allegedly late production of certain documents, including
additional drafts[10] of Anderson's screenplay.   Anderson, however,
has already adequately looked for and produced any relevant
computer files concerning the Film.   Even if additional files
exist, they would not alter the analysis as to either the
protectibility of the Screenplay or the substantial similarity of
the two works.   Likewise, any additional deposition testimony by
defendants would not alter either analysis.   Thus, Muller's
motion under Rule 56(f) is denied.

<u>CONCLUSION</u>

For the reasons set forth above, defendants' motion for
summary judgment is granted as to both the copyright infringement
claim and the breach of implied contract claim.   Muller's 56(f)
request is denied.   The amended complaint is dismissed, with
prejudice and with costs.   The Clerk of the Court shall enter
judgment accordingly and close the case.

SO ORDERED.

Dated:   New York, New York
         March 30, 2011

DENNY CHIN
United States Circuit Judge
Sitting by designation

---

[10]   These drafts were in addition to ten other completed
drafts defendants had already produced.   Tellingly, Muller's
expert's original report only analyzed two of the ten drafts that
were in Muller's possession when the report was written.   (<u>See</u>
Am. Compl., Ex. E).

- 40 -

**APPEARANCES**

Attorneys for Plaintiff:

        THE NOLAN LAW FIRM
            By:  William Paul Nolan, Esq.
        444 East 75th Street
        New York, New York  10021


Attorneys for Defendants:

        HOGAN LOVELLS US LLP
          By:  Slade R. Metcalf, Esq.
              Rachel F. Strom, Esq.
        875 Third Avenue
        New York, New York  10022

              - and -

        LEOPOLD, PETRICH & SMITH, P.C.
          By:  Louis P. Petrich, Esq.
        2049 Century Park East, Suite 3110
        Los Angeles, California  90067